IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MORGAN STANLEY & CO., INC., a
Delaware corporation,

      Plaintiff,

v.

      Case No. 08-CV-81330-KAM/Johnson

NEIL B. SOLOMON, an individual,
and NEIL B. SOLOMON, P.A.,
a Florida Professional Association,

      Defendants.
_____/

## MOTION FOR PRELIMINARY INJUNCTIVE RELIEF AND INCORPORATED MEMORANDUM OF LAW

Pursuant to Rule 65, Federal Rules of Civil Procedure, Plaintiff MORGAN STANLEY & CO., INC. (or "Morgan Stanley"), moves this Court for an Order entering preliminary injunctive relief against Defendants Neil Solomon ("Solomon") and Neil Solomon, P.A. ("P.A.") (collectively "Defendants") enjoining their representation in three pending arbitrations against Morgan Stanley before the Financial Industry Regulatory Authority ("FINRA").

Solomon represented Morgan Stanley in dozens of retail customer arbitrations between 2001 and 2003. He became intimately versed in how Morgan Stanley defends customer claims from start to finish. He was Morgan Stanley's zealous advocate, repeatedly arguing core defenses and safeguarding confidential facts about the firm and its employees. Now, in three pending customer arbitrations, Solomon is marshalling everything he learned as Morgan Stanley's lawyer against the firm. This is the exact side-switching Judge Ryskamp preliminarily enjoined in *Morgan Stanley DW, Inc. v. Kelley & Warren, P.A.*, No. 02-80225-CIV, 2002 WL 34382748, *1 (S.D. Fla. May 10, 2002). The same preliminary injunction is necessary in this case. The pending arbitrations should further be stayed pending a determination of this case.

## I. FACTUAL BACKGROUND

### Solomon's Representation Of Morgan Stanley

Solomon worked for one of Morgan Stanley's outside counsel firms, Greenberg Traurig, from September 2001 to June 2006. Solomon represented Morgan Stanley in about 50 disputes with retail investors. Most of these were brought in arbitration before the National Association of Securities Dealers ("NASD," which in July 2007 changed its name to FINRA), or the New York Stock Exchange ("NYSE"). In these matters, Solomon billed approximately 1,520 hours and about $313,000 worth of time. Three arbitrations specifically involved alleged wrongdoing at Morgan Stanley's Ft. Lauderdale branch. Greenberg Dec., Ex. A hereto.

Solomon represented Morgan Stanley mainly in cases where retail investors were suing to recover for disappointed economic expectations from their investment accounts. Most every customer maintained control over the accounts (the accounts were thus "non-discretionary"), but they blamed Morgan Stanley for their losses. The blame often was focused on the customer's broker or on branch managers. The Claimant's lawyers typically alleged misrepresentation, breach of contract, negligence, breach of fiduciary duty, failure to supervise, purported violations of the rules of Self Regulatory Organizations ("SRO rules"),[1] and violations of particular fraud statutes, often Chapter 517, Fla. Stat. *Id.*

Solomon devoted his time as Morgan Stanley's lawyer to defeating these claims. Solomon drafted detailed narrative answers, selected arbitrators under FINRA's arbitrator ranking system (which largely mirrors the picking of a jury), wrote pre-hearing arbitration briefs and motions, prepared brokers, attended final hearings, participated in mediations and settlement

---

[1] Typical SRO rules that surface in arbitration include NASD (now "FINRA") Conduct Rule 2110 ("High Standards of Commercial Honor/Equitable Principles of Trade"); NYSE Rule 401 ("Good and Ethical Business Practices"); FINRA Rule 2310 (the so-called "Suitability" rule, which measures the suitability of a broker's recommendation against the customer's financial ability to bear risk); NYSE Rule 405 ("Know Your Customer"); FINRA Rule 3010 and NYSE Rule 342 ("Negligent Supervision").

discussions, and generally worked up Morgan Stanley's defenses. In at least one case involving a fired broker of Morgan Stanley's, Solomon probed into the confidential details of the firing. *See* Greenberg Dec, Ex. A; Declaration of Allison Patton, Ex. B; examples of Solomon's briefs, Exs. C, D; and Solomon's Time entries Ex. E.

Solomon thus gained intimate knowledge of proprietary, privileged, and confidential information regarding Morgan Stanley's litigation philosophy, its methods and procedures for picking arbitrators and defending claims in litigation, its legal policies, its approaches to settlement, its settlement limits, the decision making processes of its personnel regarding legal claims, and the particular personalities, expectations, negotiation techniques, and management styles of its personnel, as well as information regarding the administration of Morgan Stanley's various business operations and the internal workings of its organization. Solomon also specifically learned confidential information about Morgan Stanley's compensation practices, broker training, and policies and procedures regarding supervision—all areas Morgan Stanley has strived to keep confidential and out of the public arena. Patton Dec., Ex. B.

Solomon ceased representing Morgan Stanley in about 2003. However, from 2003 until Solomon's departure in 2006, Greenberg continued to represent Morgan Stanley in dozens of investor arbitrations, and Solomon continued to work closely with the team of lawyers who handled the arbitrations. Greenberg Dec., Ex. A hereto.

### Solomon's Representation *Against* Morgan Stanley

In July 2008, Solomon filed arbitrations on behalf of two retail customers of Morgan Stanley, *Darren Sadik v. Morgan Stanley, Inc.,* (FINRA Case No. 08-02395), Ex. F hereto, and *Hsiang Lin Wu v. Morgan Stanley, Inc.,* (FINRA Case No. 08-02497), Ex. G. hereto. On learning that one of it former Greenberg lawyers was representing Sadik and Wu, Morgan

3

Stanley wrote Solomon raising objections to his representation. Composite Ex. H. Solomon responded to in September 2008 by bringing a third arbitration, *Lelissa and Wayne Kresigberg v. Morgan Stanley, Inc.* (FINRA Case No. 08-03217), Ex. I.

The three cases (hereafter the "Arbitrations") all involve Morgan Stanley's Ft. Lauderdale branch and a broker who was fired.[2] The Statements of Claim center largely around the broker's alleged lack of experience in the securities industry, Morgan Stanley's training and supervisory practices, and a contention, reinforced in each of the Arbitrations, that the broker made misrepresentations about allegedly unsuitable investment products. Solomon claims the broker misled the customers about investments in what are known as auction rate securities. *See* Exs. F, G, I. In *Sadik* and *Kreisberg*, Solomon alleges the broker misled the customers about a mortgage product. Exs. F, I. Ironically, Sadik and Kreisberg worked as mortgage brokers, and they signed detailed written disclosures from Morgan Stanley about the mortgage product.

Solomon's Statements of Claim are replete with references to proprietary, confidential information about Morgan Stanley learned by Solomon as Morgan Stanley's counsel. For example, Solomon raises issues about:

- Morgan Stanley's broker training program, alleging that "it appears [Morgan Stanley's] training program does not emphasize the securities laws and regulations;"

- Morgan Stanley's compensation policies, contending that the broker supposedly "was making money for" Morgan Stanley's branch manager;

- A contention that "[u]pon information and belief, a [Morgan Stanley] branch manager's compensation is based, in large part, on the

---

[2] The Arbitrations are still at a preliminary stage. One case, *Sadik*, has had its initial prehearing conferences (it took place November 10, 2008, after service of the Complaint in this case), and a final hearing was set for March 2-6, 2009, with the possibility of a continuance based on the outcome of this action to disqualify. *Wu* had a pre-hearing conference December 8, and a final hearing has been set for May 2009. No final hearing is set in *Kreisberg*.

4

> commissions and fees generated by those he is supposed to be supervising;"
>
> - Morgan Stanley's management fees policies, noting that "[i]t will be interesting to discover whether [Morgan Stanley] calculates the management fee based on the full value of the securities owned rather than the net value of the account after subtracting the margin loan;"
>
> - Morgan Stanley's defense strategies, including an argument purporting to head off an argument, made by Morgan Stanley in virtually every retail customer case (and made by Solomon himself for Morgan Stanley) that claims cannot be based on SRO rules.

*See* Exs. F, G, I. Many allegations purportedly based "upon information and belief" in fact involve matters the customers could not know, and derive directly from Solomon's representation of Morgan Stanley.

Solomon's alleged Claims include one express SRO rule, the supposed "Failure to treat the [customers] in a just and equitable manner," and claims of failure to supervise, negligence, fraudulent misrepresentation, breach of fiduciary duty, breach of contract, and alleged violations of Florida's securities fraud statute, Chapter 517—the very same claims Solomon defended as Morgan Stanley's counsel. *See* Greenberg Dec., Ex. D. The Arbitrations are also being defended and supervised by the same Morgan Stanley attorney, Allison Patton, Solomon worked under as counsel for Morgan Stanley while at Greenberg. Patton Dec., Ex. B.

In early November 2008, prior to filing this case, the undersigned contacted Solomon yet again demanding that he withdraw from the Arbitrations. Composite Ex. H. Once again, he refused.

## II.  ARGUMENT

A.  **Morgan Stanley Has A Substantial Likelihood of Success[3] As Defendants' Representation Constitutes an Impermissible Conflict of Interest Requiring Disqualification.**

### 1. Solomon's Representation Invokes R. Reg. Fla. Bar 4.1-9

The Florida Rules of Professional Conduct prohibit a lawyer from representing a client where there is a conflict of interest. Rule 4.1-9 specifically addresses former clients, providing that a lawyer shall not:

> (a)  Represent another person in the same or substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation; or
>
> (b)  Use information relating to the representation to the disadvantage of the former client except as Rule 4-1.6 would permit with respect to a client or when the information has become generally known.

R. Reg. Fla. Bar 4.1-9. To disqualify a lawyer for a conflict based on a prior representation, the movant must show (1) the existence of a prior attorney/client relationship, and (2) that the matters in the pending suit are substantially related to the previous matter or cause of action in order to warrant disqualification. *See, e.g., Morgan Stanley DW, Inc. v. Kelley & Warren, P.A.*, No. 02-80225-CIV, 2002 WL 34382748, *1 (S.D. Fla. May 10, 2002); *McPartland v. ISI Investment Services, Inc.*, 890 F.Supp. 1029, 1031 (M.D. Fla. 1995). Once a determination is made that an attorney-client relationship existed, "an irrefutable presumption [is] created that confidences were disclosed." *Zarco Supply Co. v. Bonnell*, 658 So. 2d 151, 154 (Fla. 1st DCA 1995). This irrefutable presumption "acknowledges the difficulty of proving that confidential

---

[3] A preliminary injunction is appropriate where there is a substantial likelihood of success on the merits, substantial threat of irreparable injury, the movant's own injury outweighs injury to non-movant, and injunction would not disserve the public interest. *See, e.g., Haitian Refuge Center, Inc. v. Christopher*, 43 F.3d 1431, 1432 (11th Cir. 1995).

information useful to the attorney's current client was given to the attorney. It also protects the client by not requiring disclosure of confidences previously given to the attorney" in proving the current conflict. *State Farm Mutual Automobile Ins. Co. v. K.A.W.*, 575 So. 2d 630, 634 (Fla. 1991).

### 2. Solomon And Morgan Stanley Had An Attorney-Client Relationship

Solomon represented Morgan Stanley from 2001 to 2003 in dozens of customer arbitrations. For another three years, until 2006, Solomon continued to work with lawyers at Greenberg who represented Morgan Stanley is many more disputes. Greenberg Dec., Ex. A. Greenberg's representation from 2003 to 2006 provides a basis for imputed disqualification. *See* R. Reg. Fla. Bar 4-1.9 and 4-1.10; *Kelley*, 2002 WL 34382748, at *3 (holding that where any one lawyer would be disqualified for a conflict of interest under Rule 4-1.9, "Rule 4-1.10 operates to impute the disqualification to all lawyers associated with that disqualified attorney in a firm"). Likewise, "the presumed access of a partner to confidential information imputes knowledge of that information to others in his firm." *Sears, Roebuck & Co. v. Stansbury*, 374 So. 2d 1051, 1053 (Fla. 5th DCA 1979). Accordingly, Solomon had an attorney-client relationship with Morgan Stanley from 2001 to 2006, and an irrefutable presumption arises that confidences were exchanged.

### 3. The Same Facts That Led Judge Ryskamp To Find Matters "Substantially Related" In *Kelley* Exist Here

The Arbitrations are also "substantially related" to Solomon's prior representation of Morgan Stanley. This case is virtually identical *Kelley*, in which Judge Ryskamp preliminarily enjoined former outside counsel (in that case, the law firm Kelley & Warren) from suing Morgan Stanley in a customer action. *See Kelley*, 2002 WL 34382748, at *1-5. In *Kelley*, a law firm that had previously represented Morgan Stanley for several years in retail customer disputes turned

7

around, four years after the representation ended, and sued Morgan Stanley on behalf of a customer. Morgan Stanley moved for a preliminary and permanent injunction because, as Judge Ryskamp phrased it, Kelley & Warren "not only gained access to confidential information about [Morgan Stanley] which it can now use to the disadvantage of Morgan Stanley, but also represented Morgan Stanley in cases involving the very same branch office where [the customer] maintained his account." *Id.* at *1. Morgan Stanley argued the law firm had learned confidential information on litigation strategies, approaches to settlement, internal methods of training and management that it could use to Morgan Stanley's disadvantage. Moreover, the same claims of negligence and breach of fiduciary duty that featured in cases the firm had defended for Morgan Stanley now appeared in the firm's case *against* Morgan Stanley. Judge Ryskamp held that "[d]espite Defendant's attempt to distance itself from any appearance of impropriety, the Court finds that the prior matters and the [] Arbitration are indeed substantially related." *Id.* at *4.

The attorney-client relationships in this case are no different. Solomon is bringing the same claims and employing the same theories of recovery—misrepresentation, breach of fiduciary duty, failure to supervise, negligence, breach of contract, violations of SRO rules, and violations of Florida's investor protection act—he defended as counsel for Morgan Stanley. Solomon learned the same litigation strategies, confidential settlement and defense techniques, and methods of management during his representation of Morgan Stanley that the law firm in *Kelley* had learned. *See* Patton Dec., Ex. B. And, Solomon is suing the same Ft. Lauderdale branch office he previously represented three times. Greenberg Dec., Ex. A. Solomon is also facing the same Morgan Stanley lawyer he worked under, Allison Patton, giving Solomon a key advantage in knowing her personality, her preferences in arbitrator selection, her response to litigation tactics, and her style of negotiating settlements. These facts compelled Judge Ryskamp

8

to find the matters substantially related, and thus in need of a preliminary injunction. The same result should hold true in this case.

### 4. The Matters Are Substantially Related Because Solomon Is Attacking The Very Arguments He Made For Morgan Stanley

Another way to satisfy the "substantially related" prong of R. Reg. Fla. Bar 4-1.9 is to show "the lawyer is attacking work that the lawyer performed for the former client." *Id.* (cmt.). By exploiting personalities and defense strategies against Morgan Stanley that Solomon previously put to use as counsel for Morgan Stanley, Solomon is clearly attacking work he performed for Morgan Stanley. The Statements of Claim show an even more obvious attack.

All three Claims rely alleged SRO rule violations—including specifically FINRA's "equitable principles of trade" and suitability rules, the NYSE's know your customer and "ethical business practices" rules, and the FINRA and NYSE supervision rules—to support Solomon's negligence "[f]ailure to treat [the customers] in a just and equitable manner" claims. Solomon contends, "violations [of SRO] standards are properly asserted as standards of care that broker-dealers owe their customers." *See, e.g.*, Ex. F at 22, n. 8. But as counsel for Morgan Stanley, Solomon argued:

> [I]t is well-settled that there is no private cause of action based on an alleged violation of SRO rules. [Ft.Nt. omitted] See, e.g., Thomson v. Smith Barney, Harris, Upham & Co., Inc., 709 F.2d 1413, 1419 (11th Cir. 1983) . . .
>
> *Nor can Claimant circumvent the controlling law by masquerading his industry rule claims as "tort" claims. Indeed, courts have routinely rejected such end-runs around the law by applying the basic rule that plaintiffs cannot do indirectly what they cannot do directly.* See . . . Indemnified Capital Inv. v. R.J. O'Brien and Assoc., Inc., 12 F.3d 1406, 1412 (7th Cir. 1993) (rejecting plaintiff's attempt to convert an SRO rule related to just and equitable principles of trade into a fiduciary duty claim). [Ft.Nt. See also Lantz v. Private Satellite Television, Inc., 813 F. Supp. 554, 556 (E.D. Mich. 1993) (rejecting negligence claim predicated on alleged violation of SRO rules because "[t]hese rules . . . do not create duties the breach of which are actionable by a customer.") . . .

Sample MS Answer, Ex. C at 10-11 (emphasis added).

In the current arbitrations, Solomon alleges that Morgan Stanley "assumed the duty to act as [customers'] fiduciary, and was obligated to exercise the highest degree of care in their treatment of [them]." *E.g.*, Ex. F at 21. But as counsel for Morgan Stanley, Solomon argued Morgan Stanley owes no such "fiduciary" duty:

> [T]he Second Circuit Court of Appeals (the country's leading jurisdiction on securities cases), has put to rest the notion that brokers have a wide-ranging, free-flowing, advisory responsibility for customers. See Kwiatkowski v. Bear Stearns & Co., Inc., 2002 WL 31086924 (2d Cir. Sept. 19, 2002). The Second Circuit made clear that a broker's duty is limited to a transaction-by-transaction basis. . . .

Sample MS Answer, Ex. C at 6-7.

> Claimants' Morgan Stanley account was non-discretionary. "The scope of the duty 'owed by a broker carrying a nondiscretionary account for a customer is an ***exceeding[ly] narrow one, consisting at most of a duty to properly carry out transactions ordered by the customer.***'" T-Bill Option Club v. Brown & Co. Securities Corp., 23 F.3d 410 (7th Cir. 1994) . . .
>
> "A broker has no continuing duty to keep abreast of financial information which may affect his customer's portfolio or to inform his customer of developments which could influence his investments." Leib at 953

Sample MS Memorandum (Pitcher), Ex. D at 5-6 (emphasis in the original).

Solomon bases the *Sadik* and *Kreisberg* Arbitrations largely on the contention that the broker "lied about, and failed to disclose, material facts regarding the terms and risks of the MS Pledge Mortgage," *see* Ex. I at 7-8. Solomon knows the customers in fact received, and signed, detailed written disclosures about the pledge mortgages. As counsel for Morgan Stanley, Solomon argued:

> The law is clear that an investor who receives written risk disclosures cannot claim that he relied on oral misrepresentation regarding the risk of that investment. Indeed, addressing just this point, the Eleventh Circuit has stated:
>
>> A seller who fully discloses all material information in writing should be secure in the knowledge that it has done what the law requires . . . . Otherwise even the most careful seller is at risk, for it easy to claim: "Despite what the written documents say, one of your agents told me

> something else." If such a claim of oral inconsistency were enough, sellers' risk would be greatly enlarged. All buyers would have to pay a risk premium to cover this extra cost of doing business.
>
> <u>First Union Discount Brokerage Servs. v. Milos</u>, 997 F.2d 835, 846 n.22 (11th Cir. 1993) (quoting <u>Acme Propane, Inc. v. Texaco, Inc.</u>, 844 F.2d 1317, 1322 (7th Cir. 1988)).

Sample MS Memorandum (Ryhiner), Ex. D at 3-4.

The side-switching here is obvious. Morgan Stanley could defend the current Arbitrations entirely on arguments Solomon wrote as Morgan Stanley's lawyer. Indeed, Solomon's Arbitrations now hinge on his ability to destroy those exact arguments. These are classic examples of Solomon attacking "work" Solomon performed for Morgan Stanley—specifically, the advocacy of core defenses and litigation strategies. This supports a finding of substantial relatedness.

### 5. Solomon Is Using Confidences He Learned As Counsel For Morgan Stanley

Solomon's use of specific confidential information learned as Morgan Stanley's counsel erases any question of disqualification. One of the bedrocks of the attorney-client relationship is,

> A lawyer shall not reveal information relating to representation of a client . . . . unless the client gives informed consent.

Rule 4-1.6, R. Reg. Fla. Bar; *Stansbury*, 374 So. 2d at 1053 (stressing that "[t]he obligation of an attorney to preserve the confidences and secrets of a client lies at the very foundation of the attorney-client relationship"). The principle is codified in the "former client" rule as well, which prohibits a lawyer from using "information relating to the representation to the disadvantage of the former client." R. Reg. Fla. Bar, 4-1.9(b). There is no time limit on duty of confidentiality. The duty "continues after the client-lawyer relationship has terminated." R. Reg. Fla. Bar 4-1.6 (cmt.). The Florida Supreme Court in *K.A.W.* explained the crucial policies this serves:

11

> [The rule] advances the interests of the client by encouraging a free flow of information and the development of trust essential to an attorney-client relationship. . . . However, it also serves a second purpose fundamental to a fair adversary system. Our legal system cannot function fairly or effectively if an attorney has an informational advantage in the form of confidences gained during a former representation of his client's current opponent . . . .

*K.A.W.*, 575 So. 2d at 632-33 (citations omitted).

Importantly, the rule of confidentiality "applies not merely to matters communicated in confidence by the client but also to all information relating to the representation, whatever its source." *See* R. Reg. Fla. Bar. 4-1.6 (cmt.). The duty of confidentiality "is broader than the evidentiary attorney-client privilege and applies even though the same information is discoverable from other sources." *Buntrock v. Buntrock*, 419 So. 2d 402, 403 (Fla. 4th DCA 1982). The key inquiry is "whether, but for having represented the former client, the lawyer would know or discover the information." R. Reg. Fla. Bar 4-1.90 (cmt.);[4] *Tuazon v. Royal Caribbean Cruises, Ltd.*, 641 So. 2d 417 at n.1 (Fla. 3d DCA 1994) (describing the test as whether, given the irrefutable presumption that confidences were divulged, the confidential information obtained by the lawyer in prior cases puts the defendant at an unfair disadvantage on the claims now prosecuted against it by its former lawyer).

In this case, Solomon has raised issues and factual matters he knows solely because of his representation of Morgan Stanley. For one, Solomon seeks to use to his advantage issues relating to Morgan Stanley's compensation policies—particularly, contentions relating to branch manager compensation, its allocation of management fees, and broker compensation—intended apparently to cast a supposed bad motive on the broker's recommendations and the branch

---

[4] *See also Contant v. Kawasaki Motors Corp. U.S.A., Inc.*, 826 F.Supp. 427, 428 (M.D. Fla. 1993) (holding that disqualification was warranted where counsel, who had previously represented Kawasaki in motorcycle products liability cases seven years earlier, had "become aware of the practices used by the defendant in fighting a products liability action" and had learned confidential information he would not have had access to otherwise).

manager's supervision. The same is true with respect to issues regarding Morgan Stanley's broker training program and internal policies regarding the firing of brokers (an issue Solomon had first hand experience in through his representation of Morgan Stanley, *see* Ex. E, *Corrugated Supplies* time entries). These are all matters in which Solomon received confidential information. They are also protected, confidential matters that Morgan Stanley has taken steps to ensure do not reach the public. Patton Dec., Ex. E hereto.

This goes beyond a mere inference that Solomon *could* use confidential information against Morgan Stanley. Solomon actually is using the confidential information as a central part of his cases against the firm. There is no presumption that Solomon will simply "erase from his mind the confidences he received from his former client or the plan of defense he envisaged," or pretend that Defendants might have found out this information from another source. *K.A.W.*, 575 So. 2d 633. Rather, the huge disadvantage Morgan Stanley faces from a prosecution by a former counsel so familiar with these confidential facts and defense strategies, as well as personalities, makes the cases substantially related.

Several cases, *Kelley* included, illustrate the impermissible dangers of allowing a party having worked so closely for a client to turn around and sue for the same thing. In *Tuazon*, 641 So. 2d at 417-18, the plaintiff's attorney brought a Jones Act claim for negligence against Royal Caribbean after having previously acted as a claims adjuster for the company. The lawyer had "adjusted, evaluated, investigated and handled claims . . . some of which claims were of the type involved in this case." *Id.* at n.1. The *Tuazon* court disqualified the lawyer, reasoning:

> Plaintiff's attorney (in his capacity as adjuster) was and (in his capacity as attorney) is privy to the confidential procedures and policies of the Defendant. This falls squarely within the proscription of the rule. To suggest that because Plaintiff's attorney was not functioning as a lawyer when the confidential information was learned, or that the confidential information does not relate directly to this case, begs the issue. . . . The issue is, to paraphrase the rule, does

> the information (not generally known) put the Defendant at an unfair disadvantage? This court finds that it does. [] For this reason as well, the Court should find the matter are substantially related.

*Id.*

*Stansbury*, also involving a negligence claim, reached the same result with respect to an alleged negligent product. In *Stansbury* a lawyer named Gable Dean had, in the early 1970s, represented Sears and Roper Corporation in a case alleging the negligent design of a lawnmower. Several years later, a lawyer from Dean's firm sued Sears and Roper for the negligent design of a later model lawnmower designed by the same engineer. The court disqualified the firm, finding the substantial relationship "obvious." *See Stansbury*, 374 So. 2d 1053-54.

In *Trautman v. General Motors Corp.*, 426 So. 2d 1183, (Fla. 5th DCA 1983), a lawyer suing GM for the alleged negligent design of a 1974 GM truck had worked in GM's products liability department until 1972. There, he "became acutely familiar with the entire apparatus of [GM's] litigation support resources . . . [was exposed to] [t]echnical and engineering materials, internal memoranda, correspondence and other documents . . . was closely involved with the formulation of strategy to be used by [GM] . . . [and] was privy to discussions on techniques and tactics applied by [GM] in such actions . . . ." GM asserted that "the procedures and practices of the Product Section of [GM's] General Counsel's Office are essentially the same today as they were in 1972 . . . [and] [m]ost of the personnel there in 1972 are still employed by [GM]." *Id.* at 1184-85. The *Trautman* court disqualified the lawyer despite the lawyer's argument that the negligently designed truck at issue was produced two years <u>after</u> the lawyer left GM's product liability department.

*Kelley, Tuazon, Stansbury*, and *Trautman* have an obvious trait in common with this case: they all involve individuals intensely familiar with the defense strategies, techniques, and

sensitive confidential information of corporations they once represented. The inside advantage the lawyers held over their former client was overwhelming and required disqualification. The same is clearly true in this case with respect to Defendants.

### 6. Defendants Can Be Disqualified For An Appearance Of Impropriety

Defendants can further be disqualified as Defendants' continued representation of customers in the Arbitrations would create the appearance of impropriety. Courts in Florida retain this standard as a basis for disqualification. *See, e.g., Baybrook Homes, Inc. v. Banyan Construction and Development, Inc.*, 991 F.Supp. 1440 (M.D. Fla. 1997) (holding that "in considering whether to impute disqualification between firms, therefore, this Court may consider whether the disqualification is necessary to avoid the appearance of impropriety and to protect against disclosure of confidences"); *Brotherhood Mutual Ins. Co. v. National Presto Indus., Inc.*, 846 F.Supp. 57 (M.D. Fla. 1994) (holding that Florida law requires attorneys to avoid even the appearance of professional impropriety even though the code of professional conduct does not contain an express provision prohibiting the same); *Rentclub, Inc. v. Transamerica Rental Finance Corp.*, 811 F.Supp. 651 (M.D. Fla. 1992) (finding although the Code of Professional Conduct does not contain express provisions prohibiting the appearance of impropriety, Florida law clearly retains this requirement); *Castro v. State*, 597 So. 2d 259, 260 (Fla. 1992) (recognizing the appearance of impropriety standard exists in Florida).

In this case, Solomon, a lawyer for Morgan Stanley in dozens of cases brought by retail investors over three years has not only switched sides, he is using specific confidences and tactics against Morgan Stanley for all they are worth. If this somehow escapes outright impropriety under a straight-forward application of the rules of professional conduct, it *looks* improper, and that is enough to disqualify Defendants.

### 7. P.A. Must Also Be Disqualified

Solomon's disqualification necessarily requires the disqualification of P.A. as well. Rule 4-1.10(a), R. Reg. Fla. Bar, disqualifies all lawyers in a firm "when any one of them practicing alone would be prohibited [from representing a client]." Rule 4-1.10(b) extends this principle to law firms, so that the confidential knowledge attributed to Solomon due to his former representation of Morgan Stanley may be imputed to Solomon's firm, P.A.. *See Zarco Supply Co. v. Bonnell*, 658 So. 2d 151, 154 (Fla. 1st DCA 1995).

For all of these reasons, Morgan Stanley has a substantial likelihood of success in proving that Defendants must be disqualified as counsel in the Arbitrations.

### B.  Morgan Stanley Satisfies The Other Elements Of A Preliminary Injunctions.

The elements of irreparable harm and considerations of public policy also commend the entry of a preliminary injunction. Once confidences are deemed disclosed in the course of a lawyer's representation, as they have clearly been with respect to Solomon's representation in the Arbitrations, there is no putting the "cat back in the bag." The harm which will befall Morgan Stanley cannot be quantified and will be irreparable if Defendants are not enjoined from its continuing in the Arbitration. Money damages could not compensate Morgan Stanley for this breach of the attorney-client relationship, and this conflict of interest leaves Morgan Stanley with no remedy at law. Also, Judge Ryskamp determined in *Kelley*, "[a]s the harm which may befall Morgan Stanley is unquantifiable, the threatened injury to Plaintiff outweighs the harm an injunction may cause Defendant." *Kelley*, 2002 WL 34382748, at *4.

With respect to public policy interests, the rules of professional conduct governing attorney-client confidences and conflicts of interest codify public policies that recognize the attorney-client relationship works only in an environment of trust, without fear that confidential disclosures can ever be used against the client. Rule 4-1.6, R. Reg. Fla. Bar (cmt.) (recognizing

16

that "trust is the hallmark of the attorney-client relationship [so that] [t]he client is thereby encouraged to seek legal assistance and to communicate fully and frankly with the lawyer even as to embarrassing or legally damaging subject matter"), see also *Kelley*, 2002 WL 34382748, at *4 (holding that, "[c]ertainly, maintaining the integrity of the legal system and preserving loyalty in the attorney-client relationship does not disserve the public interest").

The elements for preliminary injunctive relief have been satisfied in this instance.

### C. The Issue of Disqualification Must be Decided by This Court, And a Stay of the Arbitrations is Appropriate.

Although arbitrations are pending, this Court must still consider and rule upon the apparent violations of the Rules of Professional Conduct before it. It is not sufficient to argue the matter of disqualification could be resolved in arbitration, as there are no mechanisms for effectively regulating attorney conduct in an arbitral forum. *See Kelley*, 2002 WL 34382749 at *2 (holding "the issue of possible attorney disqualification should be decided, not by the arbitrators, but by the courts") (citing *In re Arbitration between R.3 Aerospace, Inc. and Marshall of Cambridge Aerospace, Ltd.*, 927 F.Supp. 121, 123 (S.D. N.Y. 1996)). Moreover, a trial court may properly stay arbitration of a disqualification issue because courts have the inherent power to control the conduct of attorneys appearing before them. *See Biderman Indus. Licensing, Inc. v. Avmar, N.V.*, 173 A.D.2d 401, 402 (N.Y. Sup. Ct. 1991) (affirming the stay of an arbitration over a disqualification issue).

Accordingly, this Court should determine the issue of qualification as opposed to the arbitrators, and the Arbitrations should be stayed.

WHEREFORE, Morgan Stanley respectfully requests this Court enter a preliminary injunction preventing the representation by Solomon and P.A. in the underlying Arbitrations; that this Court enjoin the further sharing of confidences by Defendants; and that this court grant such

17

other and further relief, including a stay of the underlying Arbitrations, as this court deems just, necessary, and proper.

        Respectfully submitted:

        HomerBonner, P.A.
        Attorneys for Morgan Stanley
        The Four Seasons Tower
        1441 Brickell Avenue
        Suite 1200
        Miami, Florida 33131
        Telephone: (305) 350-5100
        Telecopier: (305) 982-0064
        E-mail: phomer@homerbonner.com

        By: **/s Christopher King**
            Peter W. Homer
            Florida Bar No. 291250
            Christopher King
            Florida Bar No. 0123919

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was sent via this Court's electronic filing system and via U.S. mail this 19th day of December, 2008 to:

    David Culver Smith
    Fox Rothschild LLP
    Suite 700, Esperante Bldg.
    222 Lakeview Ave.
    West Palm Beach, Florida 33401
    Phone: 561-804-4403
    Fax: 561-835-9602
    E-mail: dcsmith@foxrothschild.com

        **/s Christopher King**
        Christopher King

G:\Docs\Wdox\CF\40787\0237\00039837.DOC