C

BEFORE THE
NASD DISPUTE RESOLUTION, INC.

In the Matter of the
Arbitration Between:

DAVID LARKIN and ANNETTE LARKIN,

   Claimants,         NASD-DR CASE NO. 03-02844

 vs.

MORGAN STANLEY DW, INC. and
DENNIS WITKOWSKI,

   Respondents.

_____/

## MORGAN STANLEY'S PRELIMINARY ANSWER AND AFFIRMATIVE DEFENSES TO CLAIMANTS' STATEMENT OF CLAIM

  Respondent Morgan Stanley DW, Inc. ("Morgan Stanley") submits the following Preliminary Answer and Affirmative Defenses to Claimants' Statement of Claim.[1] As set forth herein, Morgan Stanley specifically and generally denies each and every allegation of wrongdoing and denies any liability to Claimants for damages in any amount under any theory.

### INTRODUCTION

  In their effort to make Morgan Stanley their insurer against market losses, Claimants have concocted a vague, boilerplate Statement of Claim (the "Claim") that is filled with false and/or misleading allegations. For example, Claimants allege that they "were not experienced in investing." See Claim ¶9. This allegation is contrary to what Claimants told Morgan Stanley. The truth is that Claimants indicated, in connection with opening their Morgan Stanley accounts

---

[1] Because discovery has yet to commence and the Claim is so vague, Morgan Stanley reserves the right to supplement this Preliminary Answer.

in 1998, that they have been investing in stocks for over 30 years. See Exhibits A and B. Specifically, Claimants indicated that the 1968 was the year that they first started buying stocks. Id. Claimants also allege that their purported loss represents "almost a total loss of the Claimants (sic) savings and retirement funds." See Claim ¶14. Again, these allegations are contrary what Claimants told Morgan Stanley when they opened their accounts. Specifically, Claimants told Morgan Stanley that their net worth was $2,500,000 at the time that they opened their Morgan Stanley accounts. Claimants' self-reported net worth is more than double their purported losses.[2]

Claimants' baseless allegations reveal that the Claim is nothing more than Claimants' attempt "to twist the . . . securities laws into a scheme of cost-free speculators' insurance." In Re Merrill Lynch & Co., Inc. Research Reports Securities Litigation, 2003 WL 21500293 at *2 (S.D.N.Y. June 30, 2003). Put another way, Claimants seek to force Morgan Stanley to be their guarantor against alleged market losses incurred during a market correction of historic proportions. However, simply because Claimants allegedly lost money in their Morgan Stanely accounts does not automatically mean that they are entitled to recover the alleged damages that they seek. Claimants are required to prove that Morgan Stanely caused their damages. This they cannot do.

The evidence will show that Morgan Stanley did nothing wrong. Specifically, the evidence will show that Claimants lost money due solely to general market conditions after the market peaked. In fact, during the time that Claimants' Morgan Stanely accounts were open, the stock market experienced one of the most abrupt reversals and severe declines in its history.

Indeed, the three year period from 2000 through 2002 is the first time in over 60 years that the stock market has had three losing years in succession:

---

[2] Morgan Stanley has not had the opportunity to do a profit and loss analysis of Claimants' accounts, and therefore has not determined if Claimants lost any money at Morgan Stanely.

2

> [S]tock market historians have to go back to the years between the end of the Great Depression and [the United States'] entry into World War II (specifically 1939-1941) to find the last time in which equities fell for three years in succession.

THE VALUE LINE INVESTMENT SURVEY by Harvey S. Katz, CFA, Value Line Chief Economist (1/10/03).

This historic market decline was not limited to technology companies. In fact, during this three-year period some of the best known companies have incurred significant losses in the value of their common stock. For example, from 2000 through the end of 2002, General Motors lost close to 45% of its value, and General Electric lost over 51% of its value. During this time period, the S&P 500 lost close to 40% of its value, and the NASDAQ lost over 67%. Therefore, it is not surprising that the value of Claimants' investments also lost value after March 2000.

Yet, Claimants blame Morgan Stanley for not predicting the all-time market high and one of the most drastic and prolonged market corrections in history. However, the law does not require brokerage firms to have a crystal ball. The evidence will show that all of the investments recommended by Morgan Stanley were suited to achieve Claimants' "capital appreciation" investment objective.

Notwithstanding Claimants' assertion that some of the stocks in their portfolio were unsuitable, *"any investment that turns out badly can appear to be -- in hindsight -- a low return, high risk investment."* Olkley v. Hyperion 1999 Term Trust, Inc., 98 F.3d 2, 8 (2nd Cir. 1996) (emphasis added). Of course, "[n]ot every bad investment is a product of misrepresentation." Id. To recover in a securities case, a customer "must offer more than allegations than [his] portfolios failed to perform as predicted." Id.

Ignoring these common sense legal principles, the Claim is nothing more than a hindsighted attempt to make Morgan Stanley Claimants' guarantor against all market losses, and

3

to impose a duty on Morgan Stanley to have predicted that the roaring bull market would come to a sudden halt -- and begin a prolonged decline that would continue for three consecutive years. Of course, the law imposes no such no duty.

Indeed, the impossibility of predicting that the bull market of the 1990's would come to a sudden halt was pointed out by no less of an authority than Federal Reserve Chairman Alan Greenspan:

> It is easy to look back and declare that stock prices were destined to collapse. But at the time, it wasn't at all clear that the market was going to crash.
>
> Federal Reserve Chairman Alan Greenspan said as much last month . . . *"it was very difficult to definitively identify a bubble until after the fact -- that is, when its bursting confirmed its existence."*

GETTING GOING by Jonathan Clements, Wall Street Journal (September 11, 2002) (emphasis added).

In sum, the evidence will show that Morgan Stanley did nothing wrong. Rather, the evidence will show that in spite of Morgan Stanley's suitable recommendations for Claimants, the value of the equities in Claimants' Morgan Stanley accounts declined due solely to general market conditions after the stock market peaked. Accordingly, the Claim must be denied in its entirety.

I. **The Securities Purchased In Claimants' Accounts Were Suitable In Light Of Claimants' Wealth, Experience and "Capital Appreciation" Investment Objective.**

The essence of the Claim is that all of the securities that Claimants purchased were unsuitable.[3] The crucial factors in assessing suitability are Claimants' investment objectives, financial circumstances and prior investment experience.

---

[3] Claimants assert that their account was excessively traded but do not assert a churning claim. See Claim (Counts I, II and III). Claimants also allege that their Morgan Stanley broker was not permitted to exercise

4

Claimants were successful business owners that sold their business for $1,000,000. See Claim ¶8. Claimants' investment objective was "capital appreciation." See Exhibits A and B. Their second investment objective was "aggressive income." Id. Claimant could certainly afford to pursue their investment objective. At the time they opened their Morgan Stanley accounts, Claimants' stated that their net worth was $2,500,000, and their annual income was $120,000. Id.

The securities that Morgan Stanley recommended were perfectly suitable for Claimants in light of their "capital appreciation" investment objective, wealth and investment experience. Accordingly, Claimants' suitability claim must denied.

It is important to note that Claimants' suitability claim only applies to securities that Morgan Stanley recommended to them. See, e.g., NASD Rule 2310 ("In *recommending* to a customer, the purchase, sale or exchange of any security, a [broker] shall have reasonable grounds for believing that the *recommendation* is suitable for such customer...") (emphasis added). Therefore, Claimants' suitability claim cannot relate to their AutoNation stock which they admit they received in connection with the sale of their business. See Claim ¶8.

Moreover, to the extent that Claimants' suitability claim is based on their argument that Morgan Stanley should have recommended that Claimants sell their AutoNation stock, it should similarly be denied. Suitability claims can only be based on recommendations to purchase or sell securities. An alleged failure to make a recommendation cannot amount to a suitability claim. See, e.g., NASD Rule 2310.

---

discretion yet Claimants do not assert an unauthorized trading claim. Id. To the extent that Claimants are asserting such claims, Morgan Stanley denies that Claimants' accounts were churned and that any of the transactions in Claimants' accounts were unauthorized.

5

In a landmark opinion, the Second Circuit Court of Appeals (the country's leading jurisdiction on securities cases), has put to rest the notion that brokers have a wide-ranging, free-flowing, advisory responsibility for customers. See Kwiatkowski v. Bear Stearns & Co., Inc., 2002 WL 31086924 (2d Cir. Sept. 19, 2002). The Second Circuit made clear that a broker's duty is limited to a transaction-by-transaction basis:

> It is uncontested that a broker ordinarily has no duty to monitor a non-discretionary account, or to give advice to such a customer on an ongoing basis. The broker's duties ordinarily end after each transaction is done, and thus do not include a duty to offer unsolicited information, advice or warnings concerning the customer's investments. A non-discretionary customer, by definition, keeps controls over the account and has full responsibility for trading decisions.

Id. at *7.

Indeed, the Kwiatkowski court rejected "an open ended duty of reasonable care to a non-discretionary account that would encompass anything more than limited transaction-by-transaction duties." Id. at *10. Claimants do not allege that any of the transactions were executed improperly or they received misrepresentations from the broker. Rather, Claimants are apparently unhappy that they did not sell their AutoNation stock position at the height of the market.

Furthermore, the Kwiatkowski court made clear, to the extent that a broker gave advice, "[t]he the giving of advice triggers no ongoing duty to do so." Id. at *8. The court also reached the obvious conclusion that "if a broker were under a duty to inform all of its customers of every fact which might bear upon any security held by the customer, the broker simply could not physically perform such a duty. Id. (quotations and citations omitted). The court reinforced this rule holding:

> The giving of advice is also an unexceptional feature of the broker-client relationship. What little case law there is on the subject

6

>     makes clear that giving advice on particular occasions does not
>     alter the character of the relationship by triggering an ongoing duty
>     to advise in the future (or between transactions) or to monitor all
>     data potentially relevant to a customer's investment.

Id. at *12.

Kwiatkowski also directly addresses the Claimants' theory that a broker is somehow liable because his prediction as to the market's future movement turns out to be incorrect. Id. at *17. See also Hill v. Bache Halsey Stuart Shields, Inc., 790 F.2d 817, 824-25 (10th Cir. 1986) ("Regarding trading advice, brokers cannot be liable for honest opinions that turn out to be wrong. Otherwise brokers would refuse to take discretionary accounts and would refuse to advise on non-discretionary accounts.").

## II.  Florida Courts Have Rejected the Very Claims that Claimants Seeks to Assert.

Florida courts have enforced an investor's duty to timely object to investments he seeks to dispute. Specifically, in Hayden, Stone Inc. v. Brown, an investor attempted to bring a claim against his brokerage firm for unsuitability and churning, among other things. See 218 So. 2d 230, 231 (Fla. 4th DCA 1969). The court noted that there could be no misrepresentation because the investor had been provided with a confirmation statement for each transaction and an account statement at the end of each month. Id. at 236. Accordingly, the court concluded:

>     No matter how unsophisticated [the investor] may have been
>     insofar as prior experience in the stock market, his age, education,
>     intelligence and past business experience generally showed him to
>     have business acumen. The written confirmation slips were such
>     as could be readily understood by a person of [the investor's]
>     educational and business background. He knew commissions were
>     being charged on each transaction and the amount of such
>     commissions. He knew that the account was engaged in frequent
>     transactions. He was well aware of the fact that many of the
>     transactions were sizeable in proportion to his ability to pay. He
>     knew that the market could fluctuate up or down, and he knew that
>     some transactions resulted in gains and some resulted losses.

7

Id. Based on this reasoning – and the fact that the investor (like Claimant in this case) did not object to the investments he purchased until well after the fact – the Hayden, Stone court rejected the investor's claims for unsuitability and churning. See id. at 238.

In Gordon v. DuPont Glore Forgan, Inc., 487 F.2d 1260, (5th Cir. 1973), Florida's federal appellate court followed the Hayden, Stone decision and stated: "As we read Hayden, Stone, under Florida law a customer who knows of his broker's breach of duty and takes no action will be barred from bringing suit." Gordon, 487 F.2d at 1262.

Here, despite having full knowledge of the activity in their accounts, Claimants did not close their accounts or change the strategy which they only now allege was improper. Under Florida law as established in Hayden, Stone and Gordon, Claimants are now precluded from asserting any claims against Morgan Stanley.

### III. The Law Prohibits Claimant's "Wait-and-See" Claims.

Claimants admit that they spoke with Morgan Stanley regarding their accounts. See Claim ¶13. In addition to personal communications, Claimants also received from Morgan Stanley monthly account statement and trade confirmations reflecting every trade in their Morgan Stanley accounts. The fact that Claimants did not change their investment strategy or close their accounts shows that Claimants did not – and never did – believe that their investments were improper. The law is clear that Claimants are not permitted "to see how things work out" before taking action.

Claimants fully understood the common sense maxim that investing in the stock market is not risk-free. Claimants witnessed stock market volatility prior to 2000. For example, during the Summer of 1998, during the course of approximately one month the Dow Jones Industrial Average lost over 2000 points. Moreover, during the same time period, the Dow and the S&P

8

500 each lost over 13% of their value *in one week*. This market action occurred soon after Claimants opened their Morgan Stanley accounts and reinforced what Claimants already knew: that they could lose money pursuing their "capital appreciation" investment objective.

Armed with such knowledge, the law required Claimants to alter or cease the trading strategy that they now conveniently (and belatedly) claim did not comport with their investment objective. Yet, Claimants did nothing. Claimants' decision to continue their investment strategy triggered the "second investment decision" rule.

"By continuing to hold the securities after the discovery of the [alleged] fraud, [Claimants] [have], in effect, made a second investment unrelated to [their] initial decision to purchase the [securities]." Harris v. Union Elec. Co., 787 F.2d 355, 372 (8th Cir. 1986) (internal quotations omitted). *"[W]hat happens after this second decision has no bearing whatsoever on the measure of the plaintiff's damages."* Harris v. American Inv. Co., 523 F.2d 220, 228 (8th Cir. 1975) (emphasis added).

Above all, "[t]he law does not permit an investor to stay and see how things work out after discovering the alleged past impropriety which brought him to the decision to stay or get out, and then recover damages for events which follow the investor's decision to stay." In re Olympia Brewing Co. Sec. Litig., 1985 WL 3928, *8 (N.D. Ill. 1985). "Plaintiffs who are found to have made a second investment decision cannot recover for any losses that result from that decision... because *those losses were not caused by [their] initial decision to purchase."* Id. (emphasis added).

Stated another way:

> The purpose of the [securities laws] is to protect the innocent investor, not one who loses his innocence and then waits to see how his investment turns out before he decide to invoke the provisions of the [law].

9

Royal Air Properties v. Smith, 312 F.2d 210, 213-14 (9th 1962).

The second investment decision rule is based on the rule of law that once a party believes he has been injured, that party has a legal obligation to limit the extent of his injuries. This rule is expressed as follows:

> Under the familiar mitigation of damages principle, a party cannot recover that part of his loss caused by his own failure, once he has reason to know of the breach, to take reasonable steps to avoid further harm.... Consequently, at the point where a reasonable man either because of the breach or discovery of the fraud would have taken action to protect himself from further depreciation in the value of the claim, the claim of causation is cut and plaintiffs cannot recover damages for subsequent losses.

Foster v. Financial Tech., Inc., 517 F.2d 1068, 1072 (9th Cir. 1975).

Of course, the rule does not require the investor to sell his securities after she has reason to know of the alleged wrongdoing. Rather, the rule simply states that when the investor should have discovered the purported wrongdoing and does not take action to sell, any subsequent harm incurred by the investor will be deemed to have been caused by the investor's second investment decision to stay in the investment and not by the original alleged wrongdoing.

Claimants' claims here fall squarely within these rules and are consequently barred as a matter of law. Instead of halting the activity in their accounts, Claimants chose to wait and "see how things worked out." Morgan Stanley is not responsible for Claimants' own decision to take this course of (in)action.

## IV. There is No Private Cause Of Action For A Violation Of Industry Rules.

Notwithstanding Claimants' assertions to the contrary, the evidence will establish that Morgan Stanley complied with all of the applicable industry rules. In any event, it is well-settled

that there is no private cause of action based on an alleged violation of SRO rules.[4] See, e.g., Thomson v. Smith Barney, Harris, Upham & Co., Inc., 709 F.2d 1413, 1419 (11th Cir. 1983) ("There is no private cause of action under federal securities laws for violation of the NYSE's 'know your customer' rule or the NASD's 'suitability' rule."); Rolf v. Blyth, Eastman Dillon & Co., Inc., 570 F.2d 38, 43 n.6 (2d Cir. 1978) (holding there is no private right of action for violation of the provisions of the rules of fair practice of the NASD, NYSE or the AMEX).[5]

Nor can Claimants circumvent the controlling law by masquerading their industry rule claims as "tort" claims. Indeed, courts have routinely rejected such end-runs around the law by applying the basic rule that plaintiffs cannot do indirectly what they cannot do directly. See Knight v. E.F. Hutton & Co., Inc., 750 F. Supp. 1109, 1113 (M.D. Fla. 1990) ("[T]o the extent that Count II attempts to state separate claims pursuant to the NASD, NYSE, or AMEX Rules, it is dismissed"); Indemnified Capital Inv. v. R.J. O'Brien and Assoc., Inc., 12 F.3d 1406, 1412 (7th Cir. 1993) (rejecting plaintiff's attempt to convert an SRO rule related to just and equitable principles of trade into a fiduciary duty claim).[6]

---

[4] "Self-regulatory organizations" or "SROs" are securities industry organizations such as the National Association of Securities Dealers ("NASD") and the New York Stock Exchange ("NYSE") that are overseen and regulated by the Securities Exchange Commission ("SEC"). See PaineWebber, Inc. v. Pitchford, 721 F. Supp. 542, 549 (S.D.N.Y. 1989), aff'd sub nom, PaineWebber, Inc. v. Rutherford, 903 F.2d at 106 (2d Cir. 1990).

[5] See also Craighead v. E.F. Hutton & Co., Inc., 899 F.2d 485, 493 (6th Cir. 1990) (holding that there is no private cause of action for violations of NYSE rules); Jablon v. Dean Witter & Co., 614 F.2d 677, 680-681 (9th Cir. 1980) (rejecting implied claim based on SRO rules requiring "just and equitable principles of trade"); Pyle v. White, 796 F. Supp. 380 (S.D. Ind. 1992) (holding there is no private cause of action for violation of securities industry rules); Knight v. E.F. Hutton & Co., Inc., 750 F. Supp. 1109, 1113 (M.D. Fla. 1990) (same).

[6] See also Lantz v. Private Satellite Television, Inc., 813 F. Supp. 554, 556 (E.D. Mich. 1993) (rejecting negligence claim predicated on alleged violation of SRO rules because "[t]hese rules . . . do not create duties the breach of which are actionable by a customer."); Bloch v. Prudential Bache Securities, 707 F. Supp. 189, 195-96 (W.D. Pa. 1989) (rejecting an attempt to circumvent the rule against a private cause of action for violation of exchange rules by pleading a third party beneficiary theory); Unity House, Inc. v. North Pacific Investments, Inc., 918 F. Supp. 1384, 1394 (D. Haw. 1996) (plaintiff may not escape the lack of a private right of action for

11

Accordingly, to the extent that Claimants' claims are based on an alleged violation of the NASD's rules – or on any SRO's rules – their claims must be denied as a matter of law.

## V. Claimants' Derivative Claims Against Morgan Stanley Must Fail.

Throughout the period that Claimants maintained their Morgan Stanley accounts, Morgan Stanley fully met its duty to supervise Claimants' Morgan Stanley broker – Dennis Witkowski. Moreover, as set forth above, Mr. Witkowski violated no duties and committed no wrongs against Claimants. Because Claimants cannot establish any wrongdoing by Mr. Witkowski, their negligent supervision and other derivative claims against Morgan Stanley must likewise fail. See, e.g., Merrill Lynch, Pierce, Fenner & Smith v. Barchman, 916 F.Supp. 845, 855 (N.D. Ill. 1996) (holding that a claim for alleged failure to supervise is derivative to all other theories, so that any recovery on failure-to-supervise grounds is contingent upon recovery under some other theory).

## CONCLUSION

For the reasons set forth above, the Claim should be denied in its entirety.

## AFFIRMATIVE DEFENSES

In addition to the facts set forth above, Claimants' claims must be denied for the following additional reasons:

1. Claimants were fully advised of and understood the nature of the investments purchased in their accounts.

---

violation of exchange rules simply by asserting that such violations are "tantamount" to fraud under Rule 10b-5).

12

2. Claimants had full, complete, accurate and contemporaneous knowledge of the transactions complained of in the Claim, and are accordingly precluded from any recovery in this action.

3. Any diminution in the value of Claimants' investments made through Morgan Stanley was caused in whole or in part by the general decline in the investment markets, the economy and/or events outside the control of Morgan Stanley.

4. Claimants expressly ordered, approved, participated in and ratified the acts and transactions they complain of in the Claim. Accordingly, Claimants' claims are barred by the doctrines of waiver, estoppel and ratification.

5. Claimants' claims are barred as a result of their failure to exercise due diligence and failure to timely disaffirm the transactions and acts complained of in the Claim despite their knowledge of these alleged actions and transactions.

6. Claimants' claims are barred by their failure to minimize or mitigate their alleged damages.

7. Claimants' relationship with Morgan Stanley was contractual in nature, and, therefore, any tort claims for economic losses are barred as a matter of law.

8. Claimants are not entitled to recovery because Morgan Stanley acted at all times in good faith and exercised reasonable diligence.

9. Claimants' claims are barred by the applicable statute(s) of limitations, statute(s) of repose, and laches.

WHEREFORE, Morgan Stanley request that the Panel enter an award in its favor:

(i) Dismissing the Claim in its entirety;

(ii) Assessing all forum costs against Claimants; and

(iii) Granting Morgan Stanley such other and further relief as the Panel deems just and appropriate.

GREENBERG TAURIG, P.A.
Bradford D. Kaufman, FBN 655465
Joseph C. Coates, III, FBN 772860
Jon A. Jacobson, FBN 155748
777 S. Flagler Drive, Suite 300 East
West Palm Beach, Florida 33401
Telephone:   561-650-7900
Facsimile:   561-655-6222
*Attorneys for Morgan Stanley*

## CERTIFICATE OF SERVICE

I certify that a true copy hereof was served on July 21, 2003 by Federal Express to:

Randall W. Henley, Esq.
RANDALL W. HENLEY, P.A.
324 Datura Street, Suite 200
West Palm Beach, FL 33401

*Original and 3 copies:*

Ms. Nene Ndem, Legal Assistant
NASD REGULATION, INC.
Office of Dispute Resolution
Boca Center Tower 1
5200 Town Center Circle, Suite 400
Boca Raton, FL  33496

_____
Jon A. Jacobson