D

**THE NEW YORK STOCK EXCHANGE**

JAMES R. PITCHER and ANNETTE PITCHER,

        Claimants,

vs.                                      NYSE Docket No. 2001-008925

MORGAN STANLEY DEAN WITTER & CO.
and LAWRENCE POTTER,

        Respondents.

_____/

**RESPONDENTS' MEMORANDUM OF LAW**

    Respondents Morgan Stanley DW Inc. ("Morgan Stanley")[1] and Lawrence Potter hereby submit their Memorandum of Law.

**INTRODUCTION**

    This case is very simple.  It involves Claimants' many purchases of only one security: the common stock of  Hyseq, Inc. ("HYSQ"), a biotech company.  For a few months in early 2000, HYSQ experienced a great price run-up.  Despite the fact that, when they transferred their Morgan Stanley account, Claimants had profited over $300,000 on their HYSQ purchases, Claimants believe that they are somehow entitled to go back in time and receive HYSQ's all-time high.  Neither the law nor common sense permit a Claimant to prevail on such a crystal-ball theory.

    It is important for the Panel to understand that the evidence will be undisputed that Mr. Potter never recommended that Claimants purchase HYSQ.  There is no dispute that *every single HYSQ share that Claimants purchased was entirely their own idea.*  Morgan Stanley did not

---

[1]    Morgan Stanley is incorrectly identified in the caption.  All of Claimants' transactions were effected through Morgan Stanley DW Inc. (formerly, Dean Witter Reynolds, Inc.), the party obligated to arbitrate before the NYSE with Claimants.

follow or issue research reports on HYSQ.  Indeed, Claimants made their first purchases of this stock directly from HYSQ in a private barter, years before HYSQ was a publicly-traded company.

Claimants' golden opportunity came about because their friend and next-door neighbor, Robert Weist, happened to be one of HYSQ's founders and its Chairman of the Board.  Mr. Weist was a former Senior Vice President of Amgen, one of the most successful biotech companies in history.  Claimants believed that they were getting in on the ground floor of the "next Amgen."

The evidence adduced at the Final Hearing will show that:

- In 1994, Claimants opened their Morgan Stanley account.

    - Claimants' account was non-discretionary – i.e., Claimants did not authorize their broker to place trades without their prior approval.

    - Every stock purchased in Claimants' account over the years was unsolicited.

    - In 1994, Claimants received 14,234 HYSQ shares directly from HYSQ via a private barter with Mr. Weist.

    - HYSQ was not a publicly-traded company when Claimants received these shares.

- Claimants' cost basis for these shares was less than $5 per share.

    - In 1997, HYSQ went public, and Claimants purchased an additional 1,900 HYSQ shares through Lehman Bros. in the IPO at approximately $14 per share.

    - From the time of the IPO until early 2000, HYSQ traded in a narrow trading range.

    - In early 2000, HYSQ skyrocketed from $12 to $139 per share in less than two months.

    - Claimants, on their own initiative, purchased an additional 15,500 HYSQ shares on the way up.

2

- On 2/17/00, HYSQ closed at $120 per share, and Claimants owned 31,134 HYSQ shares. Claimants' HYSQ shares were worth over $3,700,000.

- Rather than cash in on their good fortune, Claimants' believed that HYSQ would maintain its rapid climb -- and continued to buy *more* HYSQ shares.

- On 2/18/00, Claimants purchased an additional 10,000 HYSQ shares at $123 per share.

- Also on 2/18/00, Claimants told Mr. Potter that "HYSQ is going to $250-300" per share (HYSQ reached its all-time high of $139.50 on this day).

- Two trading days later, on 2/23/00, HYSQ closed at $99 share.

- Also on 2/23/00, Mr. Potter convinced Claimants to place sell stops to protect against downside risk.

- On 3/7/00, two of the four sell stops that Mr. Potter recommended were executed, causing Claimants to sell 8,000 HYSQ shares at approximately $77 per share.

- On 3/8/00, while Mr. Potter was out of the office, Claimants cancelled the remaining sell stops orders for 8,000 more HYSQ shares (4000 at $75 per share and 4000 at $70).

- 3/8/00 is also the very first time during the relevant time period that listed options first began trading on HYSQ.

- One week later, on 3/14/00, HYSQ closed at $42 per share, almost $100 off its all-time high achieved less than three weeks prior.

- On 5/10/00, Claimants purchased an additional 2,600 HYSQ shares at approximately $28 per share.

- On 9/19/00, Claimants closed their Morgan Stanley account. HYSQ closed at $36 per share on this day.

Stated succinctly, Claimants got lucky. Then they got greedy. Rather than accept responsibility for their failure to cash in on their good fortune, Claimants seek to blame

Respondents for their so-called "losses."[2]  Crucially, however, Claimants cannot escape from the undisputed fact that Mr. Potter did not recommend or solicit any of their HYSQ purchases. Nevertheless, in their desperate attempt to recapture the windfall that fell into their lap, Claimants invent duties that do not exist.

Claimants allege that Mr. Potter had a duty to advise them to hedge their large HYSQ position.  Given that Claimants' account was non-discretionary -- and that Claimants were *not* looking to Mr. Potter for advice regarding HYSQ -- the law imposes no such duty.  In any event, even if such duty exists, the evidence will show that Mr. Potter did recommend that Claimants protect against downside risk by placing sell stop orders.[3]  Even this recommendation Claimants ignored when they cancelled two of the sell stops.

Claimants not only allege that Mr. Potter had a (non-existent) duty to recommend a hedging strategy for their HYSQ shares, they also seek to impose upon him a duty to predict HYSQ's all-time high.  Claimants' entire case depends on their argument that Mr. Potter had a duty to make recommendations that would have "preserved their gains" as measured from the all-time high that HYSQ achieved.  See Claim at ¶¶ 32, 38.  Put another way, Claimants believe

---

[2]   The evidence will show that, at the time that they closed their Morgan Stanley account, Claimants had profited over $300,000 on HYSQ.  In addition, the evidence will show that Claimants' decision to cancel the unexecuted sell stops that Mr. Potter recommended cost them a gain of over $200,000.

[3]   Strangely, Claimants allege that Mr. Potter had a duty to recommend a hedging strategy that would have been unsuitable for them.  Specifically, Claimants allege that Mr. Potter had a duty to recommend -- and Morgan Stanley was required to enter into and assume the risk of -- a complex customized over-the-counter private options transaction with them (a "collar").  While such a strategy would have protected Claimants against downside risk it would have also *limited Claimants' upside profit potential*.  Given Claimants' extreme bullishness, such a strategy would have been inconsistent with Claimants' clearly expressed investment objectives.  In addition, there was no reason that Claimants needed to enter into this complex transaction.  If Claimants were concerned that about downside risk, they could have placed sell stop orders below the current market price *without* limiting any of their upside profit potential.  Because they could have sold their HYSQ shares at any time, Claimants were not restricted from implementing this commonplace and simple protection strategy whenever they wanted to.

4

that Mr. Potter had a duty to predict that HYSQ's incredibly sharp rise would abruptly end, and that HYSQ would go down as fast as it went up.

According to Claimants, once Mr. Potter fulfilled his duty of clairvoyance, he had a duty to recommend that Claimants diversify or hedge their HYSQ shares *on the exact day* that HYSQ reached its all-time high. Incredibly, Claimants make this allegation despite the undisputed fact that they purchased an additional 10,000 HYSQ shares on the very day that Mr. Potter supposedly was required to predict HYSQ's all-time high and recommend hedging.

Evidently, Claimants believe that, in addition to predicting the all-time, Mr. Potter was required to reject Claimants' order to purchase these 10,000 shares. The law is clear, however, that a broker's duty with respect to a non-discretionary account is to carry out orders as instructed by the customer.

**A Broker's Duty With Respect To A Non-Discretionary Account Is "Exceedingly Narrow"**

Claimants' Morgan Stanley account was non-discretionary. "The scope of the duty 'owed by a broker carrying a non-discretionary account for a customer is an *exceeding narrow one, consisting <u>at most</u> of a duty to properly carry out transactions ordered by the customer.'"* T-Bill Option Club v. Brown & Co. Securities Corp., 23 F. 3d 410 (7th Cir. 1994) quoting Index Futures Group, Inc. v. Ross, 557 N.E.2d 334, 348 (Ill. App. 1st 1990); Leib v. Merrill Lynch, Pierce, Fanner & Smith, Inc., 461 F. Supp. 951, 953 (E.D. Mich. 1978), aff'd, 647 F.2d 165 (6th Cir. 1981) ("In a non-discretionary account . . . all duties to the customer cease when the transaction is closed."); see also Gochnauer v. A.G. Edwards & Sons, Inc., 810 F.2d 1042, 1049 (11th Cir. 1987) (endorsing the Leib court's limited list of duties owed by a broker to a non-discretionary account). The Leib court specifically noted that in a non-discretionary account:

> …the broker's responsibility to his customer ceases when the
> transaction is complete. A broker has no continuing duty to keep

5

> abreast of financial information which may affect his customer's
> portfolio or to inform his customer of developments which could
> influence his investments.

Leib at 953.

In any event, the evidence will show that Mr. Potter did recommend that Claimants protect against adverse price movement. When Mr. Potter convinced Claimants to place sell stops, Claimants cancelled them after some of them were executed. The evidence will also show that Mr. Potter warned Claimants about the use of margin to finance their large HYSQ position. Again, they ignored his warnings. Moreover, the evidence will show that Claimants had no desire to diversify their HYSQ holdings. To the contrary, Claimants fiercely desired to maintain their HYSQ position. Indeed, when faced with margin calls, Claimants sold their other holdings so that they could maintain as a big a HYSQ position as they could afford.

Under Illinois law, Mr. Potter had no duty to recommend that Claimants diversify and/or hedge their HYSQ holdings. Moreover, even if such a duty does exist, Mr. Potter fulfilled that duty. Because Claimants' breach of fiduciary duty and two negligence claims all depend on their allegations that Mr. Potter breached a (non-existent) duty to offer advice regarding a stock that he did not recommend, these claims must be denied.

### A Broker Is Required To Perform A Suitability Analysis
#### Only When He Recommends A Security

There is no regulatory or legal requirement mandating that a broker give advice. Rather, the fundamental duty of a broker is to recommend suitable investments. Crucially, however, unsuitability only applies to recommendations made by the broker. This is especially true where a customer is calling all the shots regarding his investments (like Claimants). Specifically, NASD Rule 2310 unambiguously states:

> In *recommending* to a customer, the purchase, sale or exchange of
> any security, a member shall have reasonable grounds for believing

that the *recommendation* is suitable for such customer.  (emphasis added).

NASD Rule 2310 (emphasis added).

In other words, "[a] member's suitability obligation . . . applies only to securities that have been recommended by the member. *It would not apply, therefore, to situations in which a member acts solely as an order-taker for persons who, on their own initiative, effect transactions without a recommendation from the member.*  NASD Notice to Members 96-60 (emphasis added).  Moreover, the NASD has recently reemphasized that a broker "who simply effects a trade initiated by a customer without a related *'recommendation'* from [the broker] is not required to perform a suitability analysis."  NASD Notice to Members 01-23 (emphasis added).

To the extent that Claimants argue that NYSE Rule 405 (the "Know your customer rule") imposes suitability obligations on brokers where they do not make a recommendation, Claimants are wrong.  The SEC has stated that the "NASD *and other suitability rules* have long applied only to *'recommended'* transactions."  Exchange Act Release 34-27160 (emphasis added).

Here, it is undisputed that Claimants made the decision on their own – without any recommendation from Mr. Potter – to purchase every single share of HYSQ that they did.  Put another way, there is no doubt that all of Claimants' purchases of HYSQ were unsolicited.[4]  Accordingly, a suitability analysis regarding Claimants' HYSQ shares was not required.

### There Can Be No Violation Of The Illinois Securities Law Where
#### No Securities Transaction Has Occurred

To prevail on their Illinois Securities Law claim, Claimants must prove a misrepresentation by Morgan Stanley "in connection with the purchase or sale of securities."

---

[4]   As discussed above, it is ironic that the only recommendations that Mr. Potter did make to Claimants regarding HYSQ were that they (1) place sell stops in order to protect against downward price movement and (2) use less margin to finance their HYSQ position.

See 815 ILCS 5/12F (emphasis added).  Claimants' Illinois Securities Law claim is based on their allegations that Mr. Potter failed to give them advice regarding diversifying and/or hedging strategies.  See Statement of Claim at ¶44.  Taking these assertions at face value, Mr. Potter's purported failure to give advice could not have resulted in a purchase or sale of securities.  Accordingly, Claimants' Illinois Securities law claim must fail.

The Illinois Securities law only applies to *purchasers* of securities.  Space v. E.F. Hutton, Inc., 544 N.E.2d 67 (Ill. App. 4th 1989) ("It is evident by the very wording under Section 13(A) that the remedies under the Illinois Blue Sky Law are available only to *purchasers* of securities.") (emphasis added) quoting Guy v. Duff & Phelps, Inc., 628 F. Supp. 252, 263 (N.D. Ill. 1985).

Claimants do not allege that Mr. Potter advised them to *purchase* securities.  Rather, Claimants allege that Mr. Potter failed to offer advice regarding the potential *sale* of their HYSQ shares.[5]

Moreover, Under Illinois law, Claimants must prove "transaction causation."  Lucas v. Downtown Greenville Investors L.P., 671 N.E.2d 389, 398 (Ill. App. 2d 1996).  Transaction causation means that the "alleged misconduct *induced* [Claimants] to *purchase* the securities in question." Id.  Here, the securities in question are HYSQ shares.  There is no doubt that every HYSQ share that Claimants purchased was there own idea.  Accordingly, any alleged misconduct did not *induce* Claimants to *purchase* their HYSQ shares, therefore could not have occurred "in connection with" Claimants' purchase of their HYSQ shares.

---

[5]    In addition, Claimants' allegations that Morgan Stanley's advertising induced them to open their account cannot support their Illinois Securities Law claim.  Statements by brokerage firms that "are connected to the broker's efforts to attract the investors business, and are not tied to a particular trade, do not meet the . . . requirement that an actionable misrepresentation be *in connection with* the purchase or sale of securities."  Bischoff v. G.K. Scott & Co., 687 F. Supp. 746, 749 (E.D.N.Y. 1986) (interpreting the "in connection with" requirement of Rule 10b-5) (emphasis added).

8

For the reasons discussed above, Claimants' Illinois Securities law claim must be denied.

### Claimants' Statutory Fraud Claim Must Fail

Claimants' statutory fraud claim is based solely on Morgan Stanley's general advertising materials, most of which materials are dated *after* Claimants opened their account. Claimants argue that the advertising is somehow fraudulent because Morgan Stanley promised to give advice and did not. This claim is meritless and ignores that nature of the relationship between Claimants and Mr. Potter. Nothing in the advertising literature converts a retail broker into a discretionary money manager, trustee, fiduciary, or a financial planner. Crucially, the advertising makes the obvious point that relationship between a client and his or her Morgan Stanley broker is based on the individual client.

The documents that Claimants attached to the Statement of Claim recognize that each relationship between a broker and his client is unique – there is no one-size-fits-all formula. The course and scope of Claimants' relationship with Mr. Potter was such that Claimants never sought investment advice from Mr. Potter. None of the stocks in the Claimants' account were the broker's recommendation. Claimants never sought financial planning from Mr. Potter. Indeed, Claimants never acted upon the research that Mr. Potter regularly sent them.

As discussed above, Claimants never listened to Mr. Potter regarding HYSQ either. Apparently, Claimants believed that they knew better than Mr. Potter. Perhaps the basis for this belief was Claimants' close relationship with the founder and Chairman of the Board of HYSQ. The bottom line is that Claimants were calling their own shots regarding their investments. Obviously, Mr. Potter could not force Claimants to do something that they did not want to do.

In any event, the evidence will show that Mr. Potter provided Claimants with advice regarding their HYSQ shares. Specifically, Mr. Potter advised Claimants to use sell stops to protect against downside risk. Mr. Potter also advised Claimants to be careful using margin to

9

finance their large HYSQ position.  For the most part, Claimants simply ignored Mr. Potter's recommendations.

In addition to proving that the advertising was false (it was not), to prevail on their statutory fraud claim, Claimants must prove that the advertising was the proximate cause of their alleged losses.  See, e.g., Ryan v. Wersi Electronic and Co., 59 F.3d 52, 53 (7th Cir. 1995); Martin v. Heinhold Commodities, Inc. 643 N.E.2d 734, 748 (Ill. 1994).

Claimants cannot prove that any alleged misrepresentation regarding Morgan Stanley's services was the proximate cause of their alleged losses.  Here, the decline in value of Claimants' HYSQ shares was not caused by a failure to give advice.  Rather, it was caused by Claimants' failure to follow advice (among other things).

The question to be asked to determine proximate causation is, "Would the decline in [Claimants'] investment have occurred even if [Respondents' supposed] misrepresentation had been true?  If the answer is "yes," [Claimants] have *failed to prove* that the [purported] misrepresentation proximately caused the decline" in their HYSQ shares.  See Adler v. William Blair & Co., 648 N.E.2d 226, 236 (Ill. App. 1st 1995).

Even assuming the purported misrepresentation to be true -- i.e., Respondents did provide Claimants with advice -- Claimants still would have incurred their alleged losses.[6]  The evidence will show that Claimants ignored advice they received regarding their HYSQ shares.  Indeed, Claimants cancelled stop loss orders that Mr. Potter ultimately prevailed upon them to place.  In fact, the evidence will show that Claimant James Pitcher stated to Mr. Potter, "I know that you're not going to like this, but I'm adding to my HYSQ position on margin."  This statement clearly

---

[6]    As discussed above, there is no need to make this assumption because Mr. Potter did in fact provide such advice.

shows that when Mr. Potter provided advice, Claimants ignored it.  Accordingly, even if Mr. Potter had a duty to give advice (he did not), his alleged failure to do so could not have caused Claimants' purported "losses."

Morgan Stanley made no misrepresentation.  In any event, the purported misrepresentation was not the proximate cause of Claimants' so-called losses.  Accordingly, Claimants' statutory fraud claim must fail.

<u>CONCLUSION</u>

Applying the evidence adduced at the Final Hearing to the controlling law will reveal that Claimants do not have a single valid claim.  Accordingly, all of Claimants' claims should be denied in their entirety.

**GREENBERG TRAURIG, P.A.**

By: _____
Bradford D. Kaufman, Esq. FBN 655465
Joseph C. Coates III, Esq. FBN 772860
Neil B. Solomon, FBN 0544973
777 South Flagler Drive, Suite 300 East
West Palm Beach, Florida 33401
Telephone:  (561) 650-7900
Facsimile: (561) 655-6222

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy hereof was served by facsimile and U.S. Mail on this 12th day of August, 2002 on:

Ronald M. Amato, Esq.
Shaheen, Novolselsky, Staat & Filipowski, P.C.
20 North Wacker Drive, Suite 2900
Chicago, IL 60606

Paula R. Union, Esq. *(Original & 3 Copies)*
Senior Arbitration Counsel
NEW YORK STOCK EXCHANGE, INC.
20 Broad Street
New York, NY 10005

Neil B. Solomon

12

**NASD DISPUTE RESOLUTION, INC.**

VICTOR RYHINER and YVONNE
RYHINER,

                    Claimants,

vs.                                   NASD-DR Arbitration No. 01-04050

MORGAN STANLEY DW, INC. d/b/a
MORGAN STANLEY,

                    Respondent.

_____/

## MORGAN STANLEY'S PRE-HEARING BRIEF

Respondent MORGAN STANLEY DW, INC. ("Morgan Stanley") hereby files its Pre-Hearing Brief.

### INTRODUCTION

Cases like this often turn on the competing oral testimony of the claimant and his broker. Here, however, the documentary evidence is dispositive, and wholly defeats all of Claimants' claims.

In connection with their purchases of the High Yield Fund, Claimants were provided with a written brochure (the "Brochure") and a prospectus (the "Prospectus") (collectively, the "Risk Disclosure Documents").[1] The Risk Disclosure Documents clearly disclosed all of the risks that Claimants falsely allege that they were not aware of. In other words, if they did not know so before they decided to purchase the High Yield Fund, Claimants knew that pursuing their investment objective of "aggressive income" entailed a certain degree of risk. Armed with this knowledge, Claimants cannot hold Morgan Stanley responsible for Claimants' own decision to

---

[1] Claimants cannot deny that they received these documents. Indeed, Claimants produced them during the course of discovery.

aggressively seek high income.  Accordingly, Claimants claims must be dismissed in their

entirety.

**I.**     **Claimants Were Provided With Explicit Written Risk Disclosures.**

The Brochure that Claimants received contains the following explicit written risk

disclosures:

> Compared with higher-rated, lower-yielding fixed-income securities, this Fund's securities *may be subject to a greater risk of loss of income and principal (including the risk of default) and greater risk of increases and decreases in net asset value due to market fluctuations.*
>
> ******
>
> High-yield bonds – also known as "junk bonds" – typically offer a higher level of income *in exchange for assuming the higher risks associated with investing in unrated or lower-rated securities.* Because of their lower credit quality ratings, *such securities are considered speculative with regard to the payment of interest and principal.*

See Brochure at 4 (emphasis added).

Similarly, the Prospectus that Claimants received contains the following explicit written

disclosures on the *first page*:

> Investors should carefully consider the relative risks, including the risk of default, of investing in high yield securities, which are commonly known as junk bonds. *Bonds of this type are considered to be speculative with regard to the payment of interest and return of principal.* Investors should also be cognizant of the fact that such securities are not generally meant for short-term investing and should assess the risks associated with an investment in the Fund.

See Prospectus at 1 (emphasis added).

In addition to this clear risk warning on the *first page* of the Prospectus, the Prospectus contained a five page section entitled "Special Risk Considerations" that fully described the potential risks and rewards of investing in the High Yield Fund.

In spite of these unambiguous warnings, Claimants allege that they believed that: (i) they "could not lose much if any of their investment"; and (ii) the interest payments "would never decrease" and "could not change" because their Morgan Stanley broker, Karen Hill, told them so. The evidence at the Final Hearing will show that Ms. Hill never made these statements.

In any event, whether or not Ms. Hill made these statements (she did not) does not matter. The fact that Claimants received the Risk Disclosure Documents wholly defeats their claims.

## II.     **The Risk Disclosure Documents Defeat Claimants' Claim.**

The law is clear that an investor who receives written risk disclosures cannot claim that he relied on oral misrepresentation regarding the risk of that investment. The Eleventh Circuit could not have made this point more clearly:

> A seller who fully discloses all material information in writing should be secure in the knowledge that it has done what the law requires . . . . Otherwise even the most careful seller is at risk, for it easy to claim: "Despite what the written documents say, one of your agents told me something else." If such a claim of oral inconsistency were enough, sellers' risk would be greatly enlarged. All buyers would have to pay a risk premium to cover this extra cost of doing business.

First Union Discount Brokerage Servs. v. Milos, 997 F.2d 835, 846 n.22 (11th Cir. 1993) (quoting Acme Propane, Inc. v. Texaco, Inc., 844 F.2d 1317, 1322 (7th Cir. 1988)).

Thus, as a matter of law, Claimants were on notice of the nature, risks, and suitability of the High Yield Fund from the time they were provided with the Risk Disclosure Documents. Accordingly, Claimants' claims are barred:

> The claims are barred by a very simple, very basic, very sensible principle of the law of fraud, both the law of securities fraud and the common law of fraud.  If a literate, competent adult is given a document that in readable and comprehensible prose says X (X might be, "this is a risky investment"), and the person who hands it to him tells him orally, not-X ("this is a safe investment"), our literate, competent adult cannot maintain an action for fraud against the issuer of the document.

Carr v. CIGNA Secs., 95 F.3d 544, 547 (7th Cir. 1996).  See also Brumbaugh v. Princeton

Partners, 985 F.2d 157, 163 (4th Cir. 1993); Calvi v. Prudential Sec., Inc., 861 F. Supp. 69. 71-

72 (C.D. Cal. 1994) (and cases cited therein); Dodds v. Cigna Sec. Inc., 12 F.3d 346, 350-51 (2$^d$

Cir. 1993) (dismissing the claims of a plaintiff who was a widow with a tenth grade education

because the prospectuses and other written materials received by the plaintiff contained warnings

that "were sufficient to put a reasonable investor of ordinary intelligence on notice of the

commissions, the risk and illiquidity of (the) investments" and that such warnings placed

plaintiff on constructive notice of her claims even though she had never read the documents).[2]

In this case, Claimants alleged that they were unaware that the High-Yield Fund was

comprised of "junk bonds" and involved various risks.  These allegations are contradicted by the

clear language in the Risk Disclosure Documents.  Therefore, to the extent that Claimants allege

Respondent misrepresented the risks and attributes of the High Yield Fund (they did not), the

clear and simple written disclosures Claimants received when they made their investment put

them on notice – as a matter of law – that their investment objective of "aggressive income"

entailed a certain degree of risk.

---

[2] Claimants cannot escape dismissal by arguing that they did not look at the first page of the prospectus or read the brochure.  The Dodds court rejected plaintiff's argument that she relied on oral statements instead of reading the prospectus and charged her with constructive notice of the risk attendant with her investment upon receipt of the prospectus.  See also First Union Discount Brokerage Servs. v. Milos, 997 F.2d 835, 846 n.22 & n.22 (11th Cir. 1993) (citing Zobrist v. Coal-X, Inc., 708 F.2d 1511, 1518 (10th Cir. 1983) (imputing knowledge of contents of prospectus to investor who did not read it).

### III.     The Law Prohibits Claimants' "Wait-and-See" Claims.

At the time they opened their Morgan Stanley account, Claimants' investment objective was "aggressive income." Claimants' now self-servingly argue that "preservation of capital" was their primary investment objective. If this was truly Claimants' trading objective, they would have never purchased the High Yield Fund.

The Risk Disclosure Documents disclosed the following to Claimants:

- The "objective" of the Fund is to seek "high current income, and, as a secondary objective, capital appreciation." See Brochure at page 1; see also Prospectus at 2 and 8.

- To achieve that objective, the High Yield Fund would invest in "junk bonds" which "typically offer a higher level of income *in exchange for assuming the higher risks associated with investing in unrated or lower-rated securities. Because of their lower credit quality ratings, such securities are considered speculative with regard to the payment of interest and principal.*" See Brochure at page 4.

Armed with such knowledge, the law required Claimants to reject the recommendation that they now conveniently (and belatedly) label unsuitable. Claimants' decision to accept the recommendation and to purchase the High Yield Fund notwithstanding their knowledge that its investment objective and risk characteristics did not comport with Claimants' supposed trading objective defeats Claimants' suitability claim:

> The purpose of the [securities laws] is to protect the innocent investor, not one who loses his innocence and then waits to see how his investment turns out before he decide to invoke the provisions of the [law].

Royal Air Properties v. Smith, 312 F.2d 210, 213-14 (9th 1962).

Put another way, the law requires that once a party believes he has been injured, that party has a legal obligation to limit the extent of his injuries. This rule is expressed as follows:

> Under the familiar mitigation of damages principle, a party cannot recover that part of his loss caused by his own failure, once he has reason to know of the breach, to take reasonable steps to avoid

> further harm.... Consequently, at the point where a reasonable man
> either because of the breach or discovery of the fraud would have
> taken action to protect himself from further depreciation in the
> value of the claim, the claim of causation is cut and plaintiffs
> cannot recover damages for subsequent losses.

Foster v. Financial Tech., Inc., 517 F.2d 1068, 1072 (9th Cir. 1975).

Here, Claimants supposedly believed that their investment in the High Yield Fund was immune from the most basic rule of investing -- i.e., higher potential returns require an investor to undertake a higher potential risk. The written Risk Disclosure Documents disabused Claimants of their notion (if it in fact even existed). Claimants are responsible for all losses that accrued after Claimants obtained this knowledge.

**IV.   Florida Courts Have Rejected the Very Claims that Claimant Seeks to Assert.**

Under Florida law, an investor cannot bring a claim against his broker if he has previously chosen not to object to the trades in question when he was first provided with a confirmation statement or account statement.

Specifically, in Hayden, Stone Inc. v. Brown, 218 So.2d 230 (Fla. 4th DCA 1969), an investor attempted to bring a claim against his brokerage firm for unsuitability, among other things. Hayden, Stone, 218 So.2d at 231. After summarizing the underlying facts, the court noted that none of the disputed investments could have been misrepresented because the investor had been provided with a confirmation statement for each transaction and an account statement at the end of each month. Id. at 236. Accordingly, the court concluded:

> No matter how unsophisticated [the investor] may have been
> insofar as prior experience in the stock market, his age, education,
> intelligence and past business experience generally showed him to
> have business acumen. The written confirmation slips were such
> as could be readily understood by a person of [the investor's]
> educational and business background . . . . He knew that the market
> could fluctuate up or down, and he knew that some transactions
> resulted in gains and some resulted losses

6

Id.  Based on this reasoning – and the fact that the investor (like Claimant in this case) did not object to the investments he purchased until well after the fact – the Hayden, Stone court rejected the investor's claims for unsuitability.  See id. at 238.

Four years later, in Gordon v. DuPont Glore Forgan, Inc., 487 F.2d 1260, (5th Cir. 1973),[3] the Fifth Circuit embraced the Hayden, Stone decision and stated: "As we read Hayden, Stone, under Florida law a customer who knows of his broker's breach of duty and takes no action will be barred from bringing suit." Gordon, 487 F.2d at 1262.

Under Florida law as established in Hayden, Stone and Gordon, Claimant is now estopped from asserting any claims against Mr. Dowd and Raymond James.

## V.    Claimant's Negligent Supervision Claim Must Fail.

Throughout the period that Claimants maintained their Morgan Stanley account, Morgan Stanley fully met its duty to supervise Ms. Hill.  Moreover, as set forth above, Ms. Hill violated no duties and committed no wrongs against Claimants.  Because Claimants cannot establish any wrongdoing by Ms. Hill, their negligent supervision and other derivative claims against Morgan Stanley must likewise fail.  See, e.g., Merrill Lynch, Pierce, Fenner & Smith v. Barchman, 916 F.Supp. 845, 855 (N.D. Ill. 1996) (holding that a claim for alleged failure to supervise is derivative to all other theories, so that any recovery on failure-to-supervise grounds is contingent upon recovery under some other theory).

---

[3] The Eleventh Circuit, in an en banc decision, Bonner v. City of Pritchard, 661 F.2d 1206, 1209 (11th Cir. 1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

## CONCLUSION

For the reasons discussed above, Claimants' claims should be denied in their entirety.

GREENBERG TRAURIG, P.A.

By: _____
    Bradford D. Kaufman, FBN 655465
    Neil B. Solomon, FBN 0544973
    Todd A. Zuckerbrod, FBN 0573337
    777 South Flagler Drive -Suite 300 East
    West Palm Beach, Florida 33401
    Telephone:   (561) 650-7900
    Facsimile:   (561) 655-6222
    *Attorneys for Morgan Stanley DW, Inc.*

## CERTIFICATE OF SERVICE

I certify that a copy hereof was served by facsimile on the _____ day of December, 2002 on:


Jeffrey R. Sonn, Esq.
SONN & EREZ, PLC
One Financial Plaza – Suite 1500
100 S.E. 3rd Avenue
Ft. Lauderdale, Florida  33394


Kelley J. Sheehan, CLA *(Original & 3 Copies)*
Arbitration Administrator
NASD DISPUTE RESOLUTION, INC.
Boca Center, Tower 1
5200 Town Center Circle
Suite 400
Boca Raton, Florida 33486

_____
Neil B. Solomon

\\wpb-srv01\404279v01\12/2/02\39657.045700

9