F

CK.

## IN ARBITRATION BEFORE FINRA DISPUTE RESOLUTION, INC.

| | | |
|---|---|---|
| DARREN SADIK | ) | |
| | ) | |
| Claimant, | ) | |
| | ) | |
| v. | ) | FINRA CASE NO. _____ |
| | ) | |
| MORGAN STANLEY, INC. | ) | |
| | ) | |
| Respondent. | ) | |

## STATEMENT OF CLAIM

Claimant, Darren Sadik, initiates this arbitration proceeding against Respondent, Morgan Stanley & Co., Inc. f/k/a Morgan Stanley DW, Inc. ("MS"), and alleges as follows:

## INTRODUCTION

Adam Hendry ("Hendry") had absolutely no experience in the securities industry before MS hired him as a stockbroker. Rather, Hendry was an unemployed furniture salesman when he entered MS' training program. MS evidently figured that if he could sell furniture, Hendry could sell securities – and other financial products. As discussed below, Hendry was not licensed to sell one of the financial products he sold to Mr. Sadik. This financial product combined with the securities sold by Hendry to Mr. Sadik has caused Mr. Sadik financial and emotional ruin.

Based on Hendry's severe (mis)conduct described below, it appears that MS' training program does not emphasize the securities laws and regulations its stockbrokers are required to follow. Unlike selling furniture, to sell securities a salesperson is required to comply with strict laws and rules during the sales process. The evidence will show that Hendry violated some of the most sacrosanct securities rules. For example, Hendry executed transactions in Mr. Sadik's accounts without his permission. Hendry also guaranteed profits.

Hendry was a natural salesman. Upon information and belief, Hendry fast became one of the biggest producers in his MS branch despite his lack of experience, and lack of knowledge

regarding of financial products he was pushing.  Based on how he handled Mr. Sadik's account, it appears that Hendry accomplished this rare feat by engaging in unauthorized trading; pushing products he was not licensed to sell; lying about the nature of the investments he pushed on his clients; guaranteeing profits; and failing to disclose the risks of the investments he pushed.

Steve Friedman was Hendry's branch manager.  As such, Mr. Friedman was required to supervise Hendry and ensure that Hendry complied with the applicable laws and regulations. Instead, Mr. Friedman ignored Hendry's blatant and multiple violations of the securities (and other) laws and regulations because Hendry was making money for Mr. Friedman.  Upon information and belief, a MS branch manager's compensation is based, in large part, on the commissions and fees generated by those he is supposed to be supervising.  Because he had no experience and was generating large fees and commissions, Hendry should have been subject to heightened supervision.  Instead, Mr. Friedman simply looked the other way because Hendry was lining his pockets with large amounts of money.

Approximately two years after MS hired Hendry, MS fired him.  MS did not fire Hendry because MS had a sudden pang of conscience regarding the unethical and illegal manner Hendry treated Mr. Sadik.  Rather, MS fired him after Hendry was charged with a Felony by the State of Florida for breaking into someone's personal residence.[1]

During the short time between MS made its fateful decision to hire an alleged criminal and then fire the alleged criminal, Hendry ruined Mr. Sadik's life.  Due solely to Hendry's and Mr. Friedman's greed, Mr. Sadik has lost his job, lost his emotional/physical health, lost his girlfriend, lost his good credit rating, lost a lucrative business opportunity, and is about to lose

---

[1] After MS was forced to fire Hendry after Henry was charged with a Felony by the State of Florida, MS assigned responsibility for Mr. Sadik's account to Carlos Granados.  Granados and Hendry had worked together with respect to Mr. Sadik's MS account.  Granados and Hendry lived together and MS knew this. Upon information and belief, even after Hendry was fired, Hendry was directing Granados with respect to the management of Mr. Sadik's MS account.

his house.  Adding insult to injury, Mr. Sadik is about to lose his house to Morgan Stanley Credit Corp. "(MSCC") -- an affiliate of MS!

Not surprisingly, all of these losses have caused Mr. Sadik to suffer severe emotional distress, which has manifested itself into physical infirmities.  Not only must Mr. Sadik must be compensated for his pecuniary losses and his emotional/physical suffering, MS must also be punished to deter it from ruining the lives of other persons.

There should be no doubt that MS is liable for causing Mr. Sadik's losses described above.  The only questions in this case should be: 1) how much MS should pay Mr. Sadik to compensate him for the losses that MS caused him, and 2) how much MS should be punished for its callous disregard of Mr. Sadik's financial and emotional well-being so that MS thinks twice before allowing one of its salespersons to ruin another person's life.

I.      **Hendry Relentlessly Pursued Mr. Sadik As A Client And Eventually Tricked Mr. Sadik To Trust Him Implicitly.**

Mr. Sadik and Hendry were former fraternity brothers who had lost contact.  By happenstance, they ran into each when they were each out socializing with their respective friends.  Hendry asked Mr. Sadik many questions regarding his finances.  Not surprisingly, Mr. Sadik was hesitant to reveal this type of personal information.  However, Hendry persisted and eventually Mr. Sadik relented.  As soon as he discovered that Mr. Sadik had disposable income, Hendry informed Mr. Sadik that he worked for MS.  Hendry also informed Mr. Sadik that "he could make him a lot of money" -- as Hendry said he supposedly had for his other clients.

Mr. Sadik did not commit to opening an MS account with Hendry at their unplanned meeting.  In fact, Mr. Sadik informed Hendry that he already had a small account with MS and that he was satisfied with his MS broker.  Mr. Sadik further informed Hendry that this small account represented Mr. Sadik only experience in the securities markets.  The two exchanged telephone numbers and went their separate ways.  Soon thereafter, Hendry aggressively pursued

3

Mr. Sadik. Indeed, Hendry repeatedly telephoned Mr. Sadik, and often showed up at Mr. Sadik's office. Each time, Hendry bragged about the high net worth clients he had and how much money he was supposedly making for them. Hendry also denigrated Mr. Sadik's then-current MS broker, telling him that he was poorly managing Mr. Sadik's money.

Eventually, Hendry's aggressive and relentless pursuit of Mr. Sadik paid off when he agreed to open an account with Hendry and to transfer his already-existing small MS account to him. The clincher for Mr. Sadik was when Hendry whispered: "Phi Kai Phi Beta Theta Pi". This is a secret "code of loyalty and honor" among the fraternity brothers of Beta Theta Pi. This secret code of honor and loyalty signifies that a brother would never betray another brother.

Once he convinced Mr. Sadik to open the MS accounts at issue, Hendry continued to pressure to Mr. Sadik to place all of his assets under Hendry's control. The evidence will show that Hendry advised Mr. Sadik not to pay capital gains taxes on two investment properties that he had sold so that Mr. Sadik could send that money to Hendry to invest. The evidence will further show that Hendry gave Mr. Sadik the impression that Hendry had an "in" with various money managers that other MS brokers did not. The evidence will also show that Hendry allowed Mr. Sadik to listen to internal conference calls between investment managers and MS brokers. All of Hendry's actions were meant to trick Mr. Sadik into believing that his "brother" was giving him the "crème-de-la-crème" of, and special access to, the investment products offered through MS.

Hendry's phony attempts to gain Mr. Sadik's trust worked. Indeed, Mr. Sadik believed that he could implicitly trust his fraternity brother to treat him with loyalty and fairness. The reality is that Hendry betrayed Mr. Sadik's trust by repeatedly violating the securities (and other) laws, rules and regulations -- causing Mr. Sadik to suffer the devastating losses described above.

II.     **Hendry Touted Auction Rate Securities As A "Cash Equivalent" and "Liquid" Investment With A "Guaranteed" Rate of Return.**

Hendry recommended that Mr. Sadik purchase Auction Rate Securities ("ARS"). Hendry represented to Mr. Sadik that ARS were equivalent to cash or money market funds; were liquid, safe investments for short-term investing and therefore Mr. Sadik's hard-earned funds would be available to him the "next day". The evidence will show that Hendy referred to ARS as "money market funds on steroids" with a "guaranteed" rate of return. Mr. Sadik believed his fraternity brother that ARS were liquid/cash-equivalents and never even considered that they would become frozen in his MS account -- as they are now.

The truth is that MS knew, but failed to disclose that ARS were not cash alternatives, but were instead, complex, long-term financial instruments with 30 year maturities, or longer. MS knew, but failed to disclose that ARS were only liquid at the time of sale because MS was artificially supporting and manipulating the ARS market to maintain the appearance of liquidity and stability. MS further knew, but failed to disclose that ARS would become illiquid as soon as MS stopped artificially supporting the ARS market. On February 13, 2008, 87% of all auctions of ARS failed when MS (and other broker-dealers) refused to continue to artificially support the ARS market. As a result, the holders of ARS (like Mr. Sadik) have no means of liquidating the ARS that MS offered and sold as a suitable alternative to money market funds and other short term cash management vehicles.

When recommending and selling the ARS, Hendry never disclosed to Mr. Sadik that ARS were subject to extreme liquidity risk that could render them *completely illiquid* in the event of a failed auction. Nor did Hendry ever disclose that MS could control the liquidity of the ARS. Nor did Hendry ever disclose that there was no active secondary market for the ARS. Indeed, Hendry said quite the opposite. Hendry affirmatively misrepresented to Mr. Sadik that ARS were safe, liquid, and cash-equivalent investments that had a "guaranteed" rate of return.

### ARS Were Only Liquid Because MS (and other broker dealers) Artificially Propped Up the Market For ARS

ARS are either debt instruments with long-term maturity (corporate or municipal bonds), or preferred shares of closed-end funds containing such securities (also known as auction rate preferred stock). The ARS at issue here are debt instruments.

The interest rate on ARS is reset on a periodic basis through a "dutch auction". In a dutch auction, a broker-dealer submits bids for ARS to an auction agent on behalf of current and prospective investors. Based on the submitted bids, the auction agent then sets the next period's interest rate by determining the lowest bid interest rate or dividend necessary to clear the total outstanding amount of ARS.

ARS auctions typically are held every 7, 28, or 35 days, and interest on the ARS is paid at the end of each auction period. If there are not enough orders to purchase all of the shares being sold at the auction (in other words, a lack of demand for the ARS), then the auction "fails", and existing investors in ARS are consequently prevented from liquidating their holdings of ARS. When an auction fails, ARS investors cannot sell their ARS positions until and unless a subsequent action is successful. *The inherent possibility of a failed ARS auction subjects investors in ARS to significant liquidity risk.*

Investing in ARS was initially limited to institutional investors, which required minimum investments of $250,000. In recent years, however, sellers of ARS (like MS) lowered the minimum amount invested to $25,000. This was done to market ARS as widely as possible to the general public. MS never disclosed the true nature of ARS and the significant liquidity risks of ARS. Rather, MS pushed as many ARS as possible onto its retail customers to unload its own ARS inventory off its already troubled balance sheet.

Until recently, broker-dealers had bid at ARS auctions on their own behalf to support ARS auctions. Put another way, broker-dealers historically had invested their own capital in

ARS to avoid auction failures.   This historical commitment to ARS made failed auctions extremely rare.   Simply put, broker-dealers like MS often controlled the liquidity of the ARS market.   As a result, these broker-dealers – including MS – marketed and sold ARS to their own customers as liquid, cash-equivalent investments.

### MS and Hendry Had A Strong Financial Incentive to Push ARS

From 1984 to 2006, the ARS market had grown to more than $200 billion.   The fees collected by the 20 or so broker-dealers (including MS) running the ARS market exceeded $600 million *per year*.   ARS were extremely profitable for MS and for the MS financial advisors who sold the ARS.   As a large underwriter of ARS, MS received significant underwriting fees from the ARS issuers.   Further, as one of the largest broker-dealers, MS was paid an annualized fee for operating the auction process.   MS also acted as principal for its own account.   Individual MS financial advisors, like Hendry, had a significant financial incentive to sell ARS, as they were compensated by MS for ARS sold to unsuspecting investors.

To keep this lucrative gravy train running, it was critically important for MS to portray the ARS market as extremely liquid because the primary target for ARS were investors with short-term investment goals and liquidity needs.   Even a hint that auction market for ARS was anything but robustly liquid would have sent investors running for the exits.   Thus, a failed auction, or even a rumor of one, was a marketing stigma that MS could not tolerate.   However, the ARS auctions were not nearly liquid enough to support the billions of dollars that MS (and other broker-dealers) were pumping out to unsuspecting investors daily.   To conceal the inherent illiquidity of the auction market – which would have been a death knell to the ARS market – MS (and other broker-dealers) agreed to engage in various practices they termed "stabilization".   Stabilization is a nice way to say "market manipulation" -- which was meant to mask an auction market that lacked sufficient demand.

7

## The SEC Fined And Censured MS (and other broker dealers)
## In Connection With Their ARS Sales Practices

In an Administrative Release dated May 31, 2006, the SEC found that MS (and other broker-dealers) engaged in various illegal practices to make it appear that the auctions were successful and legitimate when, in fact, they were not. Among other things, the SEC found that MS (and other broker-dealers) bid for its own account without disclosing this to its clients to prevent failed auctions – thereby allowing MS to inform potential buyers that no auctions had failed. The SEC also found that there was rampant submission and/or revision of bids after deadlines and found that broker-dealers collaborated with certain customers by asking them to bid at auctions and then compensating them with higher-than-clearing rates in the secondary market.

The SEC findings demonstrated that the ARS auctions were often auctions in name only and allowed broker-dealers and/or their preferred customers to earn the best interest rates and manipulate the ARS market. The 15 broker-dealers subject to the SEC's investigation were fined and censured – including MS. The SEC also ordered these broker-dealers (including MS) to "cease and desist" from these manipulative practices in the future. These sanctions, however, did not stop MS from engaging in these abusive practices to artificially support the ARS market for fear that a failed auction would stop its lucrative gravy train dead in its tracks.

## The ARS Market Collapsed But MS Has Failed Disclose This Material Information
## To Its Customers – Even To This Day

In 2007, a credit crisis of unprecedented proportions began to roil the financial markets and continues to this day. The collapse of the credit markets forced financial institutions, including MS, to write off $400 billion. These sharp losses were initially related to collapse of the housing market but eventually began to infect the ARS market.

MS struggled to maintain the illusion of a healthy/liquid ARS despite the fact that demand for ARS by its institutional clients had dried up.[2]  Rather than disclose the fast weakening demand for ARS, MS continued to intensely push ARS on their non-institutional customers (i.e., retail customers, or "suckers") as a liquid cash alternative.  By mid-2007, demand for ARS virtually disappeared.  This did not stop MS (with other broker-dealers) from continuing to manipulate the ARS auctions and to disseminate inaccurate information to falsely maintain an aura of legitimacy and liquidity for ARS.  MS engaged in this deceptive conduct to unload millions of dollars in ARS that it had in its inventory, which evidently was too much a risk for MS to take.  Instead, MS unloaded this massive risk on unsuspecting retail investors (like Mr. Sadik) by deceiving them into believing that ARS were liquid when the truth was that it was not.

By August 16, 2007, several auctions had failed which were collectively worth $6 billion.  Some credit rating agencies were advising that they "would not be surprised to see further failed auctions in the days or weeks ahead."  This prediction came true as auctions began to fail with regularity.  Some that did succeed did so only because of MS' intervention to prop them up.  Despite the fact that MS knew that there was virtually no demand for ARS, MS continued to market and sell ARS as a liquid alternative to cash and money market funds.  Finally, after unloading as many ARS from its balance sheet as it could on unsuspecting individual investors, MS stopped artificially supporting auctions and walked away from the ARS market.

On February 13, 2008, 87% of the auctions for ARS failed when MS (and other broker-dealers) collectively pulled the plug on the ARS market.  As a result, thousands of investors (like

---

[2] In addition to the credit crisis, the lack of demand by MS' institutional investors was caused, in part, by a March 2007 decision by the Financial Accounting Standards Board ("FASB") requiring ARS to be listed on corporate balance sheets as "short-term investments" rather than "cash equivalents".  Corporations responded by moving out of ARS so that their balance sheet cash positions would not be reduced as a result of the FASB decision.  As corporate demand vanished, MS was forced to keep more ARS inventory in its own accounts.

Mr. Sadik) that hold ARS which they purchased from MS are now left with illiquid ARS. It is uncertain when ARS holders will be able to sell their ARS investments, if ever. ARS holders like Mr. Sadik have no prospect of ever selling their ARS through an auction because investors are now aware that the ARS market was artificially manipulated by MS (and other broker-dealers). Further, currently there is no reliable or liquid secondary market for ARS. Mr. Sadik's only prospect is to attempt to sell his illiquid ARS at a steep discount to price he paid for them – that is, if he is ever able to sell them.

### III.   The $450,000 of ARS Currently Frozen In Mr. Sadik's Account Were Purchased By MS Without Mr. Sadik's Permission.

Mr. Sadik currently has ARS in his MS account worth $450,000. The $450,000 of ARS in Mr. Sadik's account are illiquid and Mr. Sadik therefore cannot access his hard-earned money that he used to purchase them. Mr. Sadik's inability to withdraw any of this money has caused many of the losses described above. Mr. Sadik *never authorized the purchase of these ARS*. Rather, MS purchased ARS worth $450,000 *without obtaining Mr. Sadik's permission*. The evidence will show that Hendry also purchased other securities without obtaining Mr. Sadik's approval.[3]

On or about Fall 2007, Mr. Sadik instructed Hendry and/or Granados to liquidate all of his mutual funds that he then owned. Specifically, Mr. Sadik instructed Hendry/Granados to "sell me out of the market." As he had before with respect to Mr. Sadik's instructions to sell, Hendry was very reluctant to follow Mr. Sadik's instruction. Perhaps Hendry's reluctance was because his compensation was based, in large part, by keeping as much of Mr. Sadik's assets at MS. Hendry often admonished Mr. Sadik that Hendry was in "control" of Mr. Sadik's account

---

[3] In addition to making unauthorized transactions in Mr. Sadik's account, Hendry *guaranteed profits* on many of the investments that Hendry actually discussed with Mr. Sadik. In addition to unauthorized trading, guaranteeing profits is one of the most egregious violations of the securities laws and regulations. Upon information and belief, it appears that Hendry guaranteed profits on certain types of securities because he may have received special incentive compensation in connection with selling these securities.

and that Mr. Sadik should "stop trying to run" his own account.  In any event, Hendry/Granados eventually relented and sold Mr. Sadik's mutual funds.

Mr. Sadik rightfully assumed that the cash raised from the sale of these mutual funds would be invested in money market funds.  Instead, Hendry/Granados purchased the currently-frozen ARS without informing Mr. Sadik.  Hendry/Granados make these unauthorized transactions because they and MS were compensated by MS for buying ARS -- but not compensated if the cash raised from the sale of the mutual funds was put in money market funds or cash.

Despite the fact that the now currently-frozen ARS are mislabeled as "municipal bonds" and "corporate fixed income" securities on his account statements, Mr. Sadik eventually realized that the cash raised when he "got out of the market" was placed in ARS rather than money market funds.  Mr. Sadik did not complain regarding these unauthorized transactions because he believed Hendry's prior misrepresentations that ARS were liquid and cash equivalents.  Indeed, Hendry bought ARS for Mr. Sadik prior to the unauthorized $450,000 purchase without incident.  Put another way, Mr. Sadik was able to sell the ARS he had bought previously.

Had he known the truth about ARS -- that ARS were subject to extreme liquidity risk because MS was artificially manipulating the ARS market -- Mr. Sadik would have immediately instructed Hendry to sell the ARS that are now frozen in his MS account.

IV.    MS' "Message" Regarding ARS Contains Misleading Statements and Glaring
       Omissions of Material Facts.

As stated above, Mr. Sadik currently has $450,000 of ARS frozen in his MS account.  An unsuspecting investor, however, would never know that these securities were ARS.  In fact, $300,000 of these securities are termed "Municipal Bonds" on Mr. Sadik's MS account statements.  The other $150,000 are classified as "Corporate Fixed Income" securities therein.  It appears that it is MS' policy to conceal from its own customers that they own ARS.  Given the

11

widespread adverse publicity regarding ARS, it is understandable that MS desires to hide from its customers that they own illiquid securities that were touted as liquid cash equivalents – if one assumes away MS' fiduciary duty to treat its customer's in a fair and equitable manner.

The bottom line is that *nowhere on Mr. Sadik's MS account statement does the term "Auction Rate Securities" appear* -- except buried in the so-called "notice" in the "message" section near the end of Mr. Sadik's account statement, wherein MS has inserted an "Important Notice Regarding Pricing of Auction Rate Securities". Upon information and belief, MS was required by the SEC and/or FINRA to put this so-called notice on its account statements after the now-frozen ARS were purchased.

In any event, this so-called notice states, the "following message has been added to all client account statements but applies to holders of Auction Rate Securities. Depending on your current holdings, this message may/may not be applicable to you." As stated above, however, the term "Auction Rate Securities" never appears anywhere on Mr. Sadik's MS account statement. Therefore, it is impossible for any investor to know whether the "important notice" "may/may not apply" to him.

The substance of MS' so-called notice states, in part, that:

> "Due to recent market conditions, certain Auction Rate Securities are experiencing no or limited liquidity. Therefore, the *price(s)* for any Auction Rate Securities *shown* on this statement *may not* reflect the price(s) you would receive upon the sale at auction or in a secondary market transaction ... The prices of any Auction Rate Securities on your statement are derived from various sources, and may differ from prices provided to Morgan Stanley by outside pricing services and/or from Morgan Stanley's own internal booking valuations.

This statement contains misstatements -- and glaring omissions -- of material fact. First, "Auction Rate Securities" are never "shown" on Mr. Sadik's account statement. The now-illiquid ARS on Mr. Sadik's statement are classified as either "Municipal Bonds" or "Corporate

Fixed Income" in multiple places. Simply put, the term "Auction Rate Securities" never appears. Second, the prices for the currently-illiquid ARS on Mr. Sadik's statement are at full face value at the price paid by Mr. Sadik – $450,000. Rather than "may" not reflecting current prices, MS *knows* that the prices Mr. Sadik's statement "do not" reflect current prices. Third, the prices for the ARS were <u>not</u> "derived from various sources". Indeed, no so-called source would value Mr. Sadik's ARS at full value. Finally, if MS obtained prices from "outside pricing services" that differ from the full price shown on Mr. Sadik's MS account statement, it should have disclosed that different and lower price.[4]

MS' "message" is a "notice" in name only. An investor would have no way to tell that he owned Auction Rate Securities – because MS deliberately hides this fact from its own customers. Indeed, MS' so-called "notice" is so misleading that MS' own brokers do not know if their clients own Auction Rate Securities.

At the end of the notice, MS invites customers to "contact [their] Financial Advisor" regarding Auction Rate Securities. Mr. Sadik recently did so. His current financial advisor provided the following "advice": "municipal bonds and corporate fixed income securities are <u>**not**</u> Auction Rate Securities". Like Mr. Sadik, his current financial advisor was fooled by MS' mislabeling of the ARS frozen in Mr. Sadik's account into thinking that the "important notice" did not apply to him – or he lied to Mr. Sadik.[5]

MS' "important notice" reflects a risk that MS *knew of before* touting ARS as cash-equivalent, liquid investments. Specifically, MS knew that there was a significant risk that ARS

---

[4] It appears that only true statement by MS is that valuation of Mr. Sadik's ARS is different than the valuation of those on MS' internal books – as MS is required by the FASB and the SEC to mark them to the market.

[5] Mr. Sadik's latest broker is his fourth. After Hendry was fired and Granados's employment at MS was terminated, MS assigned at least 2 new brokers to Mr. Sadik. Neither of these new brokers even called Mr. Sadik to introduce themselves. Rather, Mr. Sadik learned of his new brokers when their names mysteriously and suddenly appeared on his account statement.

could become wholly illiquid when MS ceased artificially supporting the ARS market. Had MS disclosed the risk that ARS could become illiquid, Mr. Sadik never would have purchased them in the first place and would have complained that MS purchased the currently-frozen ARS without Mr. Sadik's permission.

V. **Hendry Used High Pressure Sales Tactics To Trick Mr. Sadik To Enter Into A Morgan Stanley Pledge Mortgage – A Financial Product That In Addition to Being Not Suitable For Mr. Sadik Was Also Illegal For Hendry To Sell.**

At the time that Hendry was aggressively pursuing him as a client and artificially gaining Mr. Sadik's trust, Mr. Sadik had agreed to enter into a standard mortgage with a mortgage company that was not affiliated with MS. Because it was a conventional mortgage, Mr. Sadik planned to make a twenty percent (20%) down payment. When he learned of Mr. Sadik's plan to obtain a conventional mortgage with a non-MS affiliate, Hendry lied to Mr. Sadik to convince him to obtain a pledge mortgage from MSCC (the "MS Pledge Mortgage"). Not only was the MS Pledge Mortgage highly unsuitable for Mr. Sadik, it was illegal for Hendry to sell this product.

That Hendry has no concern for breaking the law is not a surprise as he has been charged with a Felony by State of Florida. In any event, Hendry convinced Mr. Sadik to obtain the MS Pledge Mortgage by using high-pressure sales tactics and lying regarding the terms and risks thereof. The reason he pressured Mr. Sadik with material misrepresentations and omissions was because Hendry was highly compensated for tricking Mr. Sadik into this transaction. In addition to being directly compensated for selling the MS Pledge Mortgage, Hendry's high-pressure sale of the MS Pledge Mortgage to Mr. Sadik also indirectly increased Hendry's compensation.

**Hendry Lied Regarding The Terms And Corresponding Risks Related To The MS Pledge Mortgage To Increase Hendry's Compensation**

To close his high-pressure sale of the MS Pledge Mortgage to Mr. Sadik, Hendry misrepresented the terms of same. Hendry also failed to disclose to Mr. Sadik the substantial

14

risks of the MS Pledge Mortgage.  Unfortunately, these risks materialized, causing in part Mr. Sadik financial and emotional ruin.  Hendry had no concern that the MS Pledge Mortgage was too risky, and unsuitable, for Mr. Sadik.  Rather, his only concern was to make money for himself and MS.

Pressuring Mr. Sadik into obtaining the MS Pledge Mortgage increased Hendry's compensation in two different ways.  First, Hendry received a commission or "referral fee" for each MS Pledge Mortgage he sold to his unsuspecting customers.  Second, the MS Pledge Mortgage required Mr. Sadik to keep his assets at MS, rather than withdrawing these assets to make the down payment pursuant to the conventional mortgage.  Because Hendry's compensation was based, in part, on the amount of Mr. Sadik's assets at MS, tricking Mr. Sadik into entering into the MS Pledge Mortgage -- and therefore keeping a sizeable portion of Mr. Sadik's assets at MS -- increased Hendry's compensation.  Further, upon information and belief, in determining the value of assets under management, MS counts the value of a MS Pledge Mortgage.  In short, Hendry had a major conflict of interest in selling the MS Pledge Mortgage to Mr. Sadik.

In pressuring Mr. Sadik to obtain the MS Pledge Mortgage, Hendry lied about, and failed to disclose, material facts regarding the terms and risks of the MS Pledge Mortgage.  Hendry's fist lie was initially informing Mr. Sadik that the MS Pledge Mortgage was "100% financing" and therefore Mr. Sadik did not have to put any money down.  This statement was materially misleading.

If the MS Pledge Mortgage was actually "100% financing" as initially described by Hendry, Mr. Sadik would not have been required to tie up any of his hard earned money to finance his house.  Put another way, zero percent (0%) of Mr. Sadik's hard-earned money would have been invested in – and at risk – his house.  Instead, rather than 0%, the MS Pledge

15

Mortgage required Mr. Sadik subject a significant portion of the value of his house to variety of risks associated with the investments used as collateral for the mortgage – or else lose his house. Put another way, the MS Pledge Mortgage put both Mr. Sadik's investments and house at risk. Had Hendry fully explained the terms and risks of the MS Pledge Mortgage, Mr. Sadik would never have cancelled his conventional mortgage at the last minute and never would have agreed to enter into the MS Pledge Mortgage.

It was only after Mr. Sadik agreed to scrap his plan to obtain a conventional mortgage, and obtain the MS Pledge Mortgage, did Mr. Hendry reveal the truth – but only partially. After Mr. Sadik agreed to obtain the MS Pledge Mortgage, Mr. Hendry informed Mr. Sadik that he was required to pledge as collateral securities in a MS account worth thirty nine percent (39%) of the value of the mortgage. This amount is almost double the amount that Mr. Sadik was prepared to commit as a down payment pursuant to the conventional mortgage he was about to obtain before Hendry lied to him.

In any event, in addition to Hendry's material misleading misstatement that Mr. Sadik would have to commit 0% of his hard-earned money as collateral -- versus 39% -- Hendry failed to disclose that that the MS Pledge Mortgage that Mr. Hendry pressured Mr. Sadik into also had a "maintenance" requirement. The "maintenance" requirement for the MS Pledge Mortgage is equal to thirty three percent (33%) the value of the mortgage. Hendry never disclosed this to Mr. Sadik. Hendry also never disclosed to Mr. Sadik that if the value of the securities pledged as collateral fell below the "maintenance" requirement that he would be required to deposit additional securities or cash worth sufficient value to increase the pledged collateral back the original requirement of 39% of the value of the mortgage. If Hendry informed him of the "maintenance" requirement, Mr. Sadik would never have agreed to the MS Pledge Mortgage.

Hendry also failed to disclose to Mr. Sadik that if was unable to meet a "maintenance call" by depositing additional securities or cash, then Mr. Sadik would lose his home to MSCC -- an affiliate of MS!  Failing to make this disclosure was critical, as Hendry knew that the vast majority of Mr. Sadik's liquid net worth was in his MS accounts and therefore he would not be able to deposit additional securities or cash in the event that the value of the pledged securities fell below the maintenance requirement.  This is why FINRA has published an "Investor Alert" which states that Pledge Mortgages are "not suitable for everyone".  The MS Pledge Mortgage was not suitable for Mr. Sadik because he did have enough additional cash or securities to pledge in the event the value of the initially pledged securities fell below the maintenance requirement.

The bottom line is that had Hendry accurately described the terms and risks of it, Mr. Sadik would never have agreed to obtain the MS Pledge Mortgage.  Not only did Hendry lie to convince Mr. Sadik to obtain the MS Pledge Mortgage in the first place. Hendry also lied to Mr. Sadik about the terms of the MS Pledge Mortgage after Mr. Sadik had already obtained it in order to keep as much of Mr. Sadik's hard-earned money at MS.  The reason for Hendry's first lie was because Hendry received a commission for the MS Pledge Mortgage transaction.  The reason for Hendry's second lie is that Hendry's compensation on Mr. Sadik's account was based on the value of the assets therein – including, upon information and belief the full value of the MS Pledge Mortgage itself.

Mr. Sadik desired to withdraw approximately $100,000 from his MS account that was pledged to secure the MS Pledge Mortgage.  Mr. Sadik was going to use this money to invest in a lucrative business opportunity.  Hendry lied to Mr. Sadik about the maintenance requirement to keep more of Mr. Sadik assets at MS – for no other reason than to make more money for Hendry and MS.

17

As stated above, the initial value of the securities required to be pledged for a MS Pledge Mortgage is 39% of the value of the mortgage. The maintenance requirement was that the value of the securities be at least 33% of the value of the mortgage. If the value of the securities pledged falls below 33% then the holder of an MS Pledge Mortgage is required to deposit additional securities or cash to increase the value back up to 39% of the value of the mortgage.

For example, to obtain a $1 million MS Pledge Mortgage would require that securities valued at $390,000 (39%) be in a MS account. If the value of these securities fell below $330,000 (33%), then the holder of the MS Pledge Mortgage would be required to deposit securities or cash to increase the value of the pledged securities back to $390,000. If the investor is unable to do so, the MSCC has the right to sell the MS Pledge Mortgagee's house.

To prevent Mr. Sadik from withdrawing money from MS to fund his lucrative business venture, Hendry lied to Mr. Sadik regarding the maintenance requirement. Specifically, Hendry told Mr. Sadik that he could not withdraw money because the maintenance requirement was 33% greater than the value of the initial 39% requirement -- rather than 33% of the value of the mortgage. Using the same $1 million example, according to Hendry's misrepresentation, the maintenance requirement would be $518,700 ($390,000 times 1.33) rather than $330,000. Based on his lie regarding the maintenance requirement, Hendry prohibited Mr. Sadik from withdrawing some of his hard-earned money to invest in a lucrative business opportunity.[6] At the time that Mr. Sadik sought to withdraw some of his funds, his account was well above the "real" maintenance requirement and he therefore should have been able to make his requested withdrawal.

In sum, Hendry did not inform Mr. Sadik of the terms and risks of the MS Pledge Mortgage because Hendry was highly compensated for tricking Mr. Sadik into obtaining the MS

---

[6] Mr. Sadik was also told this by Carlos Granados and at least one of the multiple MS brokers that were assigned to Mr. Sadik without his knowledge.

Pledge Mortgage. MS also indirectly compensated Hendry for selling the MS Pledge Mortgage, because rather than withdraw money from MS to make a 20% down payment on the conventional mortgage Mr. Sadik was on the verge of obtaining, Mr. Sadik was required to keep almost 200% of this amount in his MS accounts. Since Hendry's compensation was based on the amount of assets in Mr. Sadik's accounts, failing to disclose the maintenance requirement in the first place and lying about the amount of it after the fact, increased Hendry's compensation.

**Hendry Was Required To Be Licensed By The State of Florida To Sell The MS Pledge Mortgage to Mr. Sadik – But He Was Not**

To solicit a mortgage in the State of Florida a person is required to be licensed as a mortgage broker. *See* Fla. Stat. § 494 *et seq*. To obtain a license as a mortgage broker a person is required to attend many hours of classes approved by the State of Florida. *Id.* After attending these required classes, to be legally able to solicit a mortgage in the State of Florida, a person is required to pass a test administered by the State of Florida. *Id.* Upon information and belief, Hendry neither attended any of the required classes nor took or passed the required test, nor was he licensed to sell the MS Pledge Mortgage to Mr. Sadik.

Hendry violated Florida Law by soliciting the MS Pledge Mortgage he was not licensed by the State of Florida to sell. It is not surprising that Hendry violated Florida Law, as it appears that Hendry believes that laws do not apply to him: as stated above, Hendry is currently facing Felony charges by the State of Florida that he broke into someone's personal residence. In any event, it would not have been improper for Hendry to refer Mr. Sadik to someone at MSCC who was properly trained and licensed as a mortgage broker to explain the terms and risks of the MS Pledge Mortgage. Hendry never did so. Indeed, Mr. Sadik spoke with two people at MSCC. One was a paper pusher who simply forwarded to Mr. Sadik the required paperwork with "sign here" stickers attached. The other MSCC employee never spoke with Mr. Sadik regarding the terms and/or risks of the MS Pledge Mortgage. MSCC was so uninvolved with the sale of that

MS Pledge Mortgage that the evidence will show that no one from MSCC even attended the closing on same.

**VI.    Mr. Friedman Failed To Supervise Hendry – And Failed To Respond To Mr. Sadik's Desperate Pleas for Help.**

As his branch manager, Mr. Friedman had a duty to supervise Hendry. Friedman failed miserably. Given Hendry's lack of knowledge and experience, Mr. Friedman should have been paying extra attention to the manner in which Hendry generated large fees and commissions within a short time of being hired. In addition, Hendry's sale of a MS Pledge Mortgage should have been subject to increased scrutiny given the clear conflict of interest created by this product – and given the fact that a person is prohibited by Florida law from soliciting a mortgage without being licensed.

Rather than fulfill his duty to supervise Hendry, Mr. Friedman looked the other way. The reason is that, upon information and belief, Mr. Friedman's compensation was based in part the revenues that Hendry generated for MS. Had Mr. Friedman not breached his duty to supervise Hendry, Mr. Sadik would not have suffered much of the damages inflicted upon him by Hendry.

Not only did Mr. Friedman breach the duty he owed Mr. Sadik during the time that Hendry was employed by MS, Mr. Friedman has failed to even respond to Mr. Sadik's written plea regarding the desperate situation he finds himself in today due solely to Hendry's lies and deceit and Mr. Freidman's failure to prevent same. Rather than take any corrective action, Mr. Friedman did not even have the courtesy to respond to Mr. Sadik's desperate plea for help. Mr. Friedman simply ignored Mr. Sadik's written and desperate plea in callous disregard for the losses that MS caused him. When they spoke on the phone regarding the illiquid ARS, Mr. Friedman informed Mr. Sadik that "there was nothing to worry about" with respect to ARS. Perhaps Mr. Friedman is not worried about Mr. Sadik's frozen-ARS but Mr. Sadik certainly is (more than) worried.

When Mr. Sadik had questions and/or concerns regarding other securities transactions in his account, Hendry/Granados sometimes forwarded Mr. Sadik's call to Mr. Friedman. Mr. Friedman told Mr. Sadik that he should "trust" his MS brokers to make recommendations in accordance with Mr. Sadik's "best interests". Mr. Friedman could not have been more wrong. Rather than placating Mr. Sadik with mere platitudes, Mr. Friedman should have done his job and actually investigated Mr. Sadik's concerns. If he had fulfilled his duty to supervise Hendry/Granados, Mr. Friedman could have prevented Mr. Sadik's financial and emotional/physical ruin

### MS' Conduct Violated The Duties That It Owed To Mr. Sadik

Mr. Sadik relied on Hendry and MS for investment advice and recommendations. Mr. Sadik trusted that Hendry would not execute any transactions without his permission and trusted that Hendry and MS would not make material misrepresentation and material omissions of fact. Mr. Sadik also trusted that both Hendry and Mr. Friedman would put Mr. Sadik's ahead of their own. Hendry and Mr. Friedman knew that Mr. Sadik was an inexperienced investor who relied upon Mr. Hendry for truthful and suitable advice. Hendry and MS assumed the duty to act as Mr. Sadik's fiduciary, and was obligated to exercise the highest degree of care in their treatment of him. Notwithstanding these duties, Hendry's and MS' knowledge of Mr. Sadik's reliance on Hendry, Hendry made untruthful statements and failed to disclose material facts that exposed Mr. Sadik to a high degree of risk, which Mr. Sadik specifically informed that he did not want to assume.

### Summary of Claims

MS willfully, consciously, and recklessly violated the high standards of commercial honor and just principles of trade to which it is subject. The violations that occurred as a result

21

of MS' recommendations, misrepresentations, omissions, and other actions described above include the following:

    a.  Failure to treat Mr. Sadik in a just and equitable manner;[7]

    b.  Negligence, gross negligence, negligent misrepresentation and omission, and negligent supervision;[8]

    c.  Fraudulent misrepresentation and omission;

    d.  Breach of fiduciary duty;

    e.  Breach of contract; and

    f.  Violation of the Florida Securities and Investor Protection Act, Fla. Stat. §517.201, *et seq.*[9]

---

[7] Arbitrators may do justice as they see fit by applying their own sense of equity to the facts and by making an award reflecting the spirit of the agreement between the parties. *See, e.g., Silverman v. Benmor Coats, Inc.*, 461 N.E.2d 1261 (N.Y. App. Div. 1984).

[8] The standards of the profession are set forth in the rules of FINRA (including its Notices to Members), the NYSE, and the SEC; federal and state securities statutes; firm compliance manuals and procedures and relevant case law. MS was obligated to provide competent, professional securities services in accordance with those industry rules, regulations, customs and practices. While violations these standards may not be deemed to constitute separate causes of actions, they are properly asserted as standards of care against which MS' conduct must be measured in determining its liability. Courts have consistently recognized that evidence of a violation of an SRO rule is admissible as evidence of the standard of care that broker-dealers owe their customers. *See e.g. Mihara v. Dean Witter & Co., Inc.* 619 F.2d 814, 824 (9th Cir. 1980) ("The admission of testimony related to [NYSE and NASD] rules was proper precisely because the rules reflect the standard to which all brokers are held."). MS failed to abide by many FINRA and NYSE rules, including, but not limited to:

    (a)  FINRA Conduct Rule 2110 ("High Standards of Commercial Honor/equitable Principles of Trade");
    (b)  NYSE Rule 401 ("Good and Ethical Business Practices");
    (c)  FINRA Rule 2310 ("Suitability" of Recommendations);
    (d)  NYSE Rule 405 ("Know Your Customer");
    (e)  FINRA Rule 3010 ("Negligent Supervision"); and
    (f)  NYSE Rule 342 ("Negligent Supervision").

[9] All of the foregoing misconduct represents a violation of the Florida Securities and Investor Protection Act, Fla. Stat. §517.201, *et seq.* Hendry's misrepresentations and of omissions of material fact constitute: (a) a device, scheme, or artifice to defraud; (b) a method of obtaining money by means of untrue statements of material fact, and omissions of material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) a transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person. As such, the conduct described constitutes actionable fraud under Fla. Stat. §517.211.

## Relief Sought

As a result of the conduct set forth above, Mr. Sadik requests that the arbitrators issue an

Award in Mr. Sadik's favor and that the arbitrators grant Mr. Sadik the following relief:

(a)     damages based on fairness and equity;

(b)     full rescission of the ARS that Mr. Hendry sold to Mr. Sadik that he continues to hold, and prejudgment interest on all such damages at the statutory rate;

(c)     any other compensatory damages that Mr. Sadik has suffered as a result of MS' conduct, including but limited to those damages related to Mr. Sadik's severe emotional distress, and prejudgment interest on all such damages at the statutory rate;

(d)     punitive damages in an amount sufficient to punish a corporation with the net worth of MS;

(e)     attorneys' fees and costs pursuant to Fla. Stat. §517.211(6); and

(f)     such other and additional relief as the Panel may deem just and proper.

## REQUEST FOR EXPEDITED HEARING

Due to his extremely dire financial and emotional/physical situation, Mr. Sadik requests

that the Panel schedule the Final Hearing of this matter as soon as possible, and that the Final

Hearing take place in Boca Raton, Florida.

Respectfully submitted,

By:     /s/ NBS_____
Neil B. Solomon
Neil B. Solomon, P.A.
4174 St. Lukes Lane
Jupiter, Florida 33458
Phone:  561-762-4991
Fax:  561-626-6721
email:  neilbsolomonesq@gmail.com
*Attorney for Claimant Darren Sadik*

23

## CERTIFICATE OF FILING

I hereby certify that a true copy hereof was filed electronically on this 9th day of July 2008 with:

FINRA, Inc.
Office of Dispute Resolution
165 Broadway, 27th Floor
New York, NY 10006

_____/s/ NBS_____
Neil B. Solomon

24

```
RECEIVED
JUL 11 2008
FINRA-NEW YORK
DISPUTE RESOLUTION
```

Claimant(s)

In the Matter of the Arbitration Between

Name(s) of Claimant(s)    **Darren Sadik**

and

Name(s) of Respondent(s)    **Morgan Stanley + Co.**

1. The undersigned parties hereby submit the present matter in controversy, as set forth in the attached statement of claim, answers, cross claims and all related counterclaims and/or third-party claims which may be asserted, to arbitration in accordance with the Constitution, By-Laws, Rules, Regulations, and/or *Code of Arbitration Procedure* of the sponsoring organization.

2. The undersigned parties hereby state that they have read the procedures and rules of the sponsoring organization relating to arbitration.

3. The undersigned parties agree that in the event a hearing is necessary, such hearing shall be held at a time and place as may be designated by the Director of Arbitration or the arbitrator(s). The undersigned parties further agree and understand that the arbitration will be conducted in accordance with the Constitution, By-Laws, Rules, Regulations, and/or *Code of Arbitration Procedure* of the sponsoring organization

4. The undersigned parties further agree to abide by and perform any award(s) rendered pursuant to this Submission Agreement and further agree that a judgment and any interest due thereon, may be entered upon such award(s) and, for these purposes, the undersigned parties hereby voluntarily consent to submit to the jurisdiction of any court of competent jurisdiction which may properly enter such judgment

5. The parties hereto have signed and acknowledged the foregoing Submission Agreement

**Darren Sadik**
Claimant Name (please print)

Claimant's Signature                    06/25/08
                                        Date

**DARREN SADIK**
Claimant Name (please print)

Claimant's Signature                    06/25/08
                                        Date

*If needed, copy this page.*

21