G

08-24917 FL

## IN ARBITRATION BEFORE FINRA DISPUTE RESOLUTION, INC.

| | |
|---|---|
| HSIANG LIN WU | ) |
| | ) |
| Claimant, | ) |
| | ) |
| v. | )   FINRA CASE NO. _____ |
| | ) |
| MORGAN STANLEY & CO., INC. | ) |
| | ) |
| Respondent. | ) |

### STATEMENT OF CLAIM

Claimant, Hsiang Lin Wu, initiates this arbitration proceeding against Respondent, Morgan Stanley & Co., Inc. f/k/a Morgan Stanley DW, Inc. ("MS"), and alleges as follows:

### INTRODUCTION

Adam Hendry ("Hendry") had absolutely no experience in the securities industry before MS hired him as a stockbroker.  Rather, Hendry was an unemployed furniture sales clerk when he entered MS' training program.  MS evidently figured that if he could sell furniture, Hendry could sell securities.

Based on Hendry's (mis)conduct described below, it appears that MS' training program does not emphasize the securities laws and regulations its sales clerks are required to follow. Unlike selling furniture, to sell securities a salesperson is required to comply with strict laws and rules during the sales process.  The evidence will show that Hendry violated some of the most sacrosanct securities rules and regulations.  For example, Hendry executed transactions in Mr. Wu's accounts without his permission.  Hendry also guaranteed profits.

Hendry was a natural salesman.  Upon information and belief, Hendry fast became one of

regarding the financial products he was pushing.

Steve Friedman was Hendry's branch manager. As such, Mr. Friedman was required to supervise Hendry and ensure that Hendry complied with the applicable laws and regulations. Instead, Mr. Friedman ignored Hendry's blatant and multiple violations of the securities (and other) laws and regulations because Hendry was making money for Mr. Friedman. Upon information and belief, a MS branch manager's compensation is based, in large part, on the commissions and fees generated by those he is supposed to be supervising. Because he had no experience and was generating large fees and commissions, Hendry should have been subject to heightened supervision. Instead, Mr. Friedman simply looked the other way because Hendry was lining his pockets with large amounts of money.

Approximately two years after MS hired Hendry. MS fired him. MS did not fire Hendry because MS had a sudden pang of conscience regarding the unethical and illegal manner Hendry treated Mr. Wu and his other customers. Rather, MS fired him after Hendry was charged with a Felony by the State of Florida for breaking into someone's personal residence. [1]

During the short time between MS made its fateful decision to hire an alleged criminal and then fire the alleged criminal, Hendry caused Mr. Wu to suffer substantial damages. Due solely to Hendry's and Mr. Friedman's greed, Mr. Wu has lost the use of $225,000 of his hard-earned money; was delayed in starting a lucrative business opportunity; and has caused Mr. Wu to suffer severe emotional distress, which has manifested itself into physical infirmities. Not only must Mr. Wu must be compensated for his monetary losses and his emotional/physical suffering, MS must also be punished to deter it from ruining the lives of other persons.

---

assigned responsibility for Mr. Wu's account to Carlos Granados. Granados and Hendry had worked together with respect to Mr. Wu's MS account prior to Hendry being fired for allegedly breaking the law. Granados and Hendry lived together and MS knew this. Upon information and belief, even after Hendry was fired for allegedly breaking the law, Hendry was directing Granados behind the scenes with respect to the management of Mr. Wu's MS account.

I.      **Hendry Touted Auction Rate Securities As A "Cash Equivalent" and "Liquid" Investment With a "Guaranteed" Rate of Return To Convince Mr. Wu To Open A MS Account.**

Mr. Wu was reluctant to open the MS account at issue. But Hendry was very persistent. Mr. Wu repeatedly informed Hendry that he was risk-adverse. Eventually, Hendry's aggressive pursuit of Mr. Wu's money paid off when he informed Mr. Wu of an investment that Mr. Wu had never heard of – Auction Rate Securities ("ARS").

Hendry described ARS as "the same as a money market." Hendry further explained that ARS were "next day fully liquid cash-equivalents" but better than a money market fund because ARS offer a "higher *guaranteed* rate of return." Mr. Wu believed Hendry that ARS were liquid/cash-equivalents and never even considered that they could become frozen -- as they are now.[2] Based on Hendry's misrepresentation regarding ARS, Mr. Wu agreed to transfer $250,000 of his hard-earned money to Hendry at MS to invest in ARS.

The truth is that MS knew, but failed to disclose that ARS were not cash alternatives, but were instead, complex, long-term financial instruments with 30 year maturities, or longer. MS knew, but failed to disclose that ARS were only liquid at the time of sale because MS was artificially supporting and manipulating the ARS market to maintain the appearance of liquidity and stability. MS further knew, but failed to disclose that ARS would become illiquid as soon as MS stopped artificially supporting the ARS market. On February 13, 2008, 87% of all auctions of ARS failed when MS (and other broker-dealers) refused to continue to artificially support the ARS market. As a result, the holders of ARS (like Mr. Wu) have no means of liquidating the ARS that MS offered and sold as a suitable alternative to money market funds and other short

---

[2] The ARS that are illiquid and at issue in this case are no longer held at MS as Mr. Wu transferred his account on or about the same time Hendry was fired after being charged with a Felony by the State of Florida.

When recommending and selling the ARS, Hendry never disclosed to Mr. Wu that ARS were subject to extreme liquidity risk that could render them *completely illiquid* in the event of a failed auction. Nor did Hendry ever disclose that MS could control the liquidity of the ARS. Nor did Hendry ever disclose that there was no active secondary market for the ARS. Indeed, Hendry said quite the opposite. Hendry affirmatively misrepresented to Mr. Wu that ARS were liquid, and cash-equivalent investments with a "guaranteed" rate of return.

## ARS Were Only Liquid Because MS (and other broker dealers) Artificially Propped Up the Market For ARS

ARS are either debt instruments with long-term maturity (corporate or municipal bonds), or preferred shares of closed-end funds containing such securities (also known as auction rate preferred stock). The ARS at issue here are debt instruments.

The interest rate on ARS is reset on a periodic basis through a "dutch auction". In a dutch auction, a broker-dealer submits bids for ARS to an auction agent on behalf of current and prospective investors. Based on the submitted bids, the auction agent then sets the next period's interest rate by determining the lowest bid interest rate or dividend necessary to clear the total outstanding amount of ARS.

ARS auctions typically are held every 7, 28, or 35 days, and interest on the ARS is paid at the end of each auction period. If there are not enough orders to purchase all of the shares being sold at the auction (in other words, a lack of demand for the ARS), then the auction "fails", and existing investors in ARS are consequently prevented from liquidating their holdings of ARS. When an auction fails, ARS investors cannot sell their ARS positions until and unless a subsequent action is successful. *The inherent possibility of a failed ARS auction subjects investors al ARS to significant liquidity risk.*

Investing in ARS was initially limited to institutional investors, which required minimum investments of $250,000. In recent years, however, sellers of ARS (like MS) lowered the

minimum amount invested to $25,000. This was done to market ARS as widely as possible to the general public. MS never disclosed the true nature of ARS and the significant liquidity risks of ARS. Rather, MS pushed as many ARS as possible onto its retail customers to unload its own ARS inventory off its already troubled balance sheet.

Until recently, broker-dealers had bid at ARS auctions on their own behalf to support ARS auctions. Put another way, broker-dealers historically had invested their own capital in ARS to avoid auction failures. This historical commitment to ARS made failed auctions extremely rare. Simply put, broker-dealers like MS often controlled the liquidity of the ARS market. As a result, these broker-dealers – including MS – marketed and sold ARS to their own customers as liquid, cash-equivalent investments.

## MS and Hendry Had A Strong Financial Incentive to Push ARS

From 1984 to 2006, the ARS market had grown to more than $200 billion. The fees collected by the 20 or so broker-dealers (including MS) running the ARS market exceeded $600 million *per year*. ARS were extremely profitable for MS and for the MS financial advisors who sold the ARS. As a large underwriter of ARS, MS received significant underwriting fees from the ARS issuers. Further, as one of the largest broker-dealers, MS was paid an annualized fee for operating the auction process. MS also acted as principal for its own account. Individual MS financial advisors, like Hendry, had a significant financial incentive to sell ARS, as they were compensated by MS for ARS sold to unsuspecting investors.

To keep this lucrative gravy train running, it was critically important for MS to portray the ARS market as extremely liquid because the primary target for ARS were investors with short-t · · anything but robustly liquid would have sent investors running for the exits. Thus, a failed auction, or even a rumor of one, was a marketing stigma that MS could not tolerate. However,

5

the ARS auctions were not nearly liquid enough to support the billions of dollars that MS (and other broker-dealers) were pumping out to unsuspecting investors daily. To conceal the inherent illiquidity of the auction market – which would have been a death knell to the ARS market – MS (and other broker-dealers) agreed to engage in various practices they termed "stabilization". Stabilization is a nice way to say "market manipulation" -- which was meant to mask an auction market that lacked sufficient demand.

### The SEC Fined And Censured MS (and other broker dealers) In Connection With Their ARS Sales Practices

In an Administrative Release dated May 31, 2006, the SEC found that MS (and other broker-dealers) engaged in various illegal practices to make it appear that the auctions were successful and legitimate when, in fact, they were not. Among other things, the SEC found that MS (and other broker-dealers) bid for its own account without disclosing this to its clients to prevent failed auctions – thereby allowing MS to inform potential buyers that no auctions had failed. The SEC also found that there was rampant submission and/or revision of bids after deadlines and found that broker-dealers collaborated with certain customers by asking them to bid at auctions and then compensating them with higher-than-clearing rates in the secondary market.

The SEC findings demonstrated that the ARS auctions were often auctions in name only and allowed broker-dealers and/or their preferred customers to earn the best interest rates and manipulate the ARS market. The 15 broker-dealers subject to the SEC's investigation were fined and censured – including MS. The SEC also ordered these broker-dealers (including MS) to "cease and desist" from these manipulative practices in the future. These sanctions, however, did not stop MS from engaging in these abusive practices to artificially support the ARS market for fear that a failed auction would stop its lucrative gravy train dead in its tracks.

6

## The ARS Market Collapsed But MS Has Failed Disclose This Material Information
## To Its Customers – Even To This Day

In 2007, a credit crisis of unprecedented proportions began to roil the financial markets and continues to this day. The collapse of the credit markets forced financial institutions, including MS, to write off $400 billion. These sharp losses were initially related to collapse of the housing market but eventually began to infect the ARS market.

MS struggled to maintain the illusion of a healthy/liquid ARS despite the fact that demand for ARS by its institutional clients had dried up. In addition to the credit crisis, the lack of demand by MS' institutional investors was caused, in large part, by a March 2007 decision by the Financial Accounting Standards Board ("FASB") requiring ARS to be listed on corporate balance sheets as "short-term investments" rather than "cash equivalents". Corporations responded by moving out of ARS so that their balance sheet cash positions would not be reduced as a result of the FASB decision. As corporate demand vanished, MS was forced to keep more ARS inventory in its own accounts. MS always knew that ARS were not "cash equivalents". Even after the FASB decision, MS still did not disclose to its customers that ARS were "short-term investments" rather than "cash equivalents".

In any event, rather than disclose the fast weakening demand for ARS, MS continued to intensely push ARS on their non-institutional customers (i.e., retail customers, or "suckers") as a liquid cash alternative. By mid-2007, demand for ARS virtually disappeared. This did not stop MS (with other broker-dealers) from continuing to manipulate the ARS auctions and to disseminate inaccurate information to falsely maintain an aura of legitimacy and liquidity for ARS. MS engaged in this deceptive conduct to unload millions of dollars in ARS that it had in its inventory, which evidently was too much a risk for MS to take. Instead, MS unloaded this massive risk on unsuspecting retail investors (like Mr. Wu) by deceiving them into believing that ARS were liquid when the truth was that it was not.

7

By August 16, 2007, several auctions had failed which were collectively worth $6 billion. Some credit rating agencies were advising that they "would not be surprised to see further failed auctions in the days or weeks ahead." This prediction came true as auctions began to fail with regularity. Some that did succeed did so only because of MS' intervention to prop them up. Despite the fact that MS knew that there was virtually no demand for ARS, MS continued to market and sell ARS as a liquid alternative to cash and money market funds. Finally, after unloading as many ARS from its balance sheet as it could on unsuspecting individual investors, MS stopped artificially supporting auctions and walked away from the ARS market.

On February 13, 2008, 87% of the auctions for ARS failed when MS (and other broker-dealers) collectively pulled the plug on the ARS market. As a result, thousands of investors (like Mr. Wu) that hold ARS which they purchased from MS are now left with illiquid ARS. It is uncertain when ARS holders will be able to sell their ARS investments, if ever. ARS holders like Mr. Wu have no prospect of ever selling their ARS through an auction because investors are now aware that the ARS market was artificially manipulated by MS (and other broker-dealers). Further, currently there is no reliable or liquid secondary market for ARS. Mr. Wu's only prospects are either to attempt to sell his illiquid ARS at a steep discount to price he paid for them — that is, if he is ever able to sell them or, bring this Claim to rescind the unauthorized purchase of the ARS.

II.    **The $225,000 of Mr. Wu's ARS That Are Currently Frozen Were Purchased Without Mr. Wu's Knowledge – As Were Other Securities.**

The initial $250,000 ARS recommended by Hendry and purchased by Mr. Wu immediately upon opening his MS account are not the ARS at issue in this case. Very soon after he convinced Mr. Wu to transfer the initial $250,000 to open his MS account, Hendry persistently badgered Mr. Wu to sell them and buy a variety of mutual funds and other funds (the "Funds").

8

As part of his repeated attempts to convince Mr. Wu to buy these investments that Mr. Wu did not desire, Hendry *guaranteed* that they would be profitable. Not only did Hendry guarantee that these risky investments would be profitable overall, Hendry *guaranteed* that they would not fluctuate more than 1% on a daily basis due to what Hendry told Mr. Wu was his "extremely conservative allocation." It is appears that the only reason that Hendry *guaranteed* profits on these investments to induce Mr. Wu to buy them was because Hendry greatly increased the commissions/fees he generated by his multiple buys and sells of the Funds.

Eventually, Hendry liquidated most of the Funds without informing Mr. Wu. Hendry used the proceeds of these sales to again purchase ARS for Mr. Wu. This time, however, Hendry did not tell Mr. Wu he was doing so. Indeed, until recently, Mr. Wu was under the impression that the ARS securities that are currently frozen and illiquid were the same ARS that were purchased at the inception of Mr. Wu's account.

Mr. Wu currently has ARS worth $225,000. Mr. Wu's $225,000 of ARS are illiquid and Mr. Wu therefore cannot access his hard-earned money that Hendry used to purchase them. Mr. Wu's inability to withdraw any of this money has caused him to delay a lucrative business opportunity and caused the Mr. Wu severe emotional distress, and other losses. The evidence will show that Hendry also purchased and sold other securities without obtaining Mr. Wu's approval. Like guaranteeing profits, unauthorized trading is one of the most egregious violations of the securities laws and regulations. Engaging in authorized trading to generate fees and commissions is even worse.

The cash raised from the sale of the Funds that Hendry bought should have been left in cash · · without informing Mr. Wu. Hendry make these unauthorized transactions because he and MS

9

were compensated by MS for buying ARS -- but not compensated if the cash raised from the sale of these investments was left in cash or put in money market funds.

### III.   MS Purposely Hid From Its Customers That They Owned ARS.

An unsuspecting MS customer would never know that he owned ARS. In fact, MS uses the term "Municipal Bonds" and "Corporate Fixed Income Securities" on its customers' account statements to describe ARS. It appears that it is MS' policy to conceal from its own customers that they own ARS. Given the widespread adverse publicity regarding ARS, it is understandable that MS desires to hide from its customers that they own illiquid securities that MS touted as liquid cash equivalents – if one assumes away MS' fiduciary duty to treat its customer's in a fair and equitable manner.

The bottom line is that *nowhere on Mr. Wu's MS account statement did the term "Auction Rate Securities" appear*. MS has recently included a so-called "notice" in the "message" section of its account statements wherein MS has inserted an "Important Notice Regarding Pricing of Auction Rate Securities". Upon information and belief, MS was required by the SEC and/or FINRA to put this so-called notice on its account statements after the now-frozen ARS were purchased.

In any event, this so-called notice states, the "following message has been added to all client account statements but applies to holders of Auction Rate Securities. Depending on your current holdings, this message may/may not be applicable to you." As stated above, however, the term "Auction Rate Securities" never appears anywhere on MS' account statements.

Therefore, it is impossible for any investor to know whether the "important notice" "may/

> "Due to recent market conditions, certain Auction Rate Securities
> are experiencing no or limited liquidity. Therefore, the *price(s)* for
> any Auction Rate Securities *shown* on this statement *may not*
> reflect the price(s) you would receive upon the sale at auction or in

> a secondary market transaction ... The prices of any Auction Rate Securities on your statement are derived from various sources, and may differ from prices provided to Morgan Stanley by outside pricing services and/or from Morgan Stanley's own internal booking valuations.

This statement contains misstatements -- and glaring omissions -- of material fact. First, "Auction Rate Securities" are never "shown" on the MS account statement. The now-illiquid ARS that Mr. Wu's owns were classified as either "Municipal Bonds" or "Corporate Fixed Income" in multiple places on his MS account statement. The term "Auction Rate Securities" never appears. Second, the prices for the currently-illiquid ARS on Mr. Wu's statement were at full face value at the price paid by Mr. Wu. Rather than "may" not reflecting current prices, MS *knows* that the prices that were on Mr. Wu's statement "do not" reflect current prices. Third, the prices for the ARS were not "derived from various sources". Rather, no source would value Mr. Wu's ARS at full face value. Finally, if MS obtained prices from "outside pricing services" that differed than the full price shown on Mr. Wu's MS account statement, it should have disclosed that different and lower price.[3]

MS' "message" is a "notice" in name only. An investor would have no way to tell that he owned Auction Rate Securities – because MS deliberately hides this fact from its own customers. Indeed, the evidence will show that MS' so-called "notice" is so misleading that MS' own brokers do not know if their clients own Auction Rate Securities. .

At the end of the notice, MS invites customers to "contact [their] Financial Advisor" regarding Auction Rate Securities. One of Mr. Wu's friends, and another MS customer, recently did so. His current financial advisor provided the following "advice": "municipal bonds and corpor:.

---

[3] It appears that only true statement by MS is that valuation of Mr. Wu's ARS is different than the valuation of those on MS' internal books – as MS is required by the FASB and the SEC to mark them to the market.

11

called financial advisors were fooled by MS' mislabeling of the ARS frozen in Mr. Wu's friend's MS account into thinking that the "important notice" did not apply to him – or he lied to Mr. Wu's fellow MS customer.

MS' "important notice" reflects a risk that MS *knew of before* touting ARS as cash-equivalent, liquid investments. Specifically, MS knew that there was a significant risk that ARS could become wholly illiquid when MS ceased artificially supporting the ARS market. Had MS disclosed the risk that ARS could become illiquid, Mr. Wu never would have purchased them.

## IV.   Mr. Friedman Failed To Supervise Hendry.

As his branch manager, Mr. Friedman had a duty to supervise Hendry. Friedman failed miserably. Given Hendry's lack of knowledge and experience, Mr. Friedman should have been paying extra attention to the manner in which Hendry generated large fees and commissions within a short time of being hired.

Rather than fulfill his duty to supervise Hendry, Mr. Friedman looked the other way. The reason is that, upon information and belief, Mr. Friedman's compensation was based in part the revenues that Hendry generated for MS. Had Mr. Friedman not breached his duty to supervise Hendry, Mr. Wu would not have suffered much of the damages inflicted upon him by Hendry.

## MS' Conduct Violated The Duties That It Owed To Mr. Wu

Mr. Wu relied on Hendry for investment advice and recommendations. Mr. Wu trusted that Hendry would not execute any transactions without his permission and trusted that Hendry would not make material misrepresentation and material omissions of fact. Mr. Wu also trusted that both Hendry and Mr. Friedman would put Mr. Wu's interest ahead of their own. Hendry and Mr.

for truthful and suitable advice. Hendry and MS assumed the duty to act as Mr. Wu's fiduciary, and was obligated to exercise the highest degree of care in their treatment of him.

12

Notwithstanding these duties, Hendry's and MS' knowledge of Mr. Wu's reliance on Hendry, Hendry made untruthful statements and failed to disclose material facts that exposed Mr. Wu to a high degree of risk, which Mr. Wu specifically informed that he did not want to assume.

## Summary of Claims

MS willfully, consciously, and recklessly violated the high standards of commercial honor and just principles of trade to which it is subject. The violations that occurred as a result of MS' recommendations, misrepresentations, omissions, and other actions described above include the following:

    a. Failure to treat Mr. Wu in a just and equitable manner;[4]

    b. Negligence, gross negligence, negligent misrepresentation and omission, and negligent supervision;[5]

    c. Fraudulent misrepresentation and omission;

    d. Breach of fiduciary duty;

---

[4] Arbitrators may do justice as they see fit by applying their own sense of equity to the facts and by making an award reflecting the spirit of the agreement between the parties. *See e.g., Silverman v. Benmor Coats, Inc.*, 461 N.E.2d 1261 (N.Y. App. Div. 1984).

[5] The standards of the profession are set forth in the rules of FINRA (including its Notices to Members), the NYSE, and the SEC; federal and state securities statutes; firm compliance manuals and procedures and relevant case law. MS was obligated to provide competent, professional securities services in accordance with those industry rules, regulations, customs and practices. While violations of these standards may not be deemed to constitute separate causes of actions, they are properly asserted as standards of care against which MS' conduct must be measured in determining its liability. Indeed, courts have consistently recognized that evidence of a violation of an SRO rule is admissible as evidence of the standard of care that broker-dealers owe their customers. *See e.g. Mihara v. Dean Witter & Co., Inc.* 619 F.2d 814, 824 (9th Cir. 1980) ("The admission of testimony related to [NYSE and NASD] rules was proper precisely because the rules reflect the standard to which all brokers are held."). MS failed to abide by many FINRA and NYSE rules, including, but not limited to:

    (a) FINRA Conduct Rule 2110 ("High Standards of Commercial Honor/equitable Principles of

    (c) FINRA Rule 2310 ("Suitability" of Recommendations);
    (d) NYSE Rule 405 ("Know Your Customer");
    (e) FINRA Rule 3010 ("Negligent Supervision"); and
    (f) NYSE Rule 342 ("Negligent Supervision").

13

e. Breach of contract; and

f. Violation of the Florida Securities and Investor Protection Act, Fla. Stat. §517.201, *et seq.*[6]

## Relief Sought

As a result of the conduct set forth above, Mr. Wu requests that the arbitrators issue an Award in Mr. Wu's favor and that the arbitrators grant Mr. Wu the following relief:

(a)   damages based on fairness and equity;

(b)   full rescission of the ARS that Mr. Hendry sold to Mr. Wu that he continues to hold, and prejudgment interest on all such damages at the statutory rate;

(c)   any other compensatory damages that Mr. Wu has suffered as a result of MS' conduct, including but limited to those damages related to Mr. Wu's lost potentially lucrative business opportunity, severe emotional distress, losses and commissions/fees on the unauthorized and unsuitable non-ARS transactions, and prejudgment interest on all such damages at the statutory rate;

(d)   punitive damages in an amount sufficient to punish a corporation with the net worth of MS;

(e)   attorneys' fees and costs pursuant to Fla. Stat. §517.211(6); and

(f)   such other and additional relief as the Panel may deem just and proper.

## REQUEST FOR EXPEDITED HEARING

Due to his dire financial and emotional situation, Mr. Wu requests that the Panel schedule the Final Hearing of this matter as soon as possible, and that the Final Hearing take place in Orlando, Florida.

---

[6] All of the foregoing misconduct represents a violation of the Florida Securities and Investor Protection Act, Fla. Stat. §517.201, *et seq. See, e.g., Newsom v. Dean Witter Reynolds, Inc.*, 558 So.2d 1076, 1077 (Fla. 1st DCA 1990) ("an unsuitable trading violation of Section 517.301(1), Florida Statutes, is not merely technical. Just like churning, it is statutory fraud."). Hendry's misrepresentations and of omissions . . . . . . . . . . . . . obtai . . . . . . . . . . . . . . . . . . . . . . in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) a transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person. As such, the conduct described constitutes actionable fraud under Fla. Stat. §517.211.

14

Respectfully submitted,

By:  /s/ NBS

Neil B. Solomon
Neil B. Solomon, P.A.
4174 St. Lukes Lane
Jupiter, Florida 33458
Phone: 561-762-4991
Fax: 561-626-6721
email: neilbsolomonesq@gmail.com
*Attorney for Claimant Sean Wu*

## CERTIFICATE OF FILING

I hereby certify that a true copy hereof was filed electronically on this 21st day of July 2008 with:

FINRA, Inc.
Office of Dispute Resolution
165 Broadway, 27th Floor
New York, NY 10006

/s/ NBS

Neil B. Solomon