I

## IN ARBITRATION BEFORE FINRA DISPUTE RESOLUTION, INC.

MELISSA KREISBERG and )
WAYNE M. KREISBERG )
                                                              )
           Claimants,            )
                                                               )
               v.                )    FINRA CASE NO. _____
                                                                )
MORGAN STANLEY & CO., INC. )
                                                              )
           Respondent.          )

### STATEMENT OF CLAIM

Claimants, Melissa Kreisberg and Wayne M. Kreisberg, initiate this arbitration proceeding against Respondent, Morgan Stanley & Co., Inc. f/k/a Morgan Stanley DW, Inc. ("MS"), and allege as follows:

### INTRODUCTION

Adam Hendry ("Hendry") had absolutely no experience in the securities industry before MS hired him as a stockbroker. Rather, Hendry was an unemployed furniture salesman with no experience in the securities industry when he entered MS' training program. MS evidently figured that if he could sell furniture, Hendry could sell securities.

Based on Hendry's misconduct described below, it appears that MS' training program does not emphasize the securities laws and regulations its salesmen are required to follow. Unlike selling furniture, to sell securities a salesperson is required to comply with strict laws and rules during the sales process. The evidence will show that Hendry violated some of the most sacrosanct securities rules and regulations. For example, Hendry executed transactions in the Kreisberg's accounts without their permission. Hendry also guaranteed profits to Mr. Kreisberg.[1]

---

[1] Although one of the accounts at issue was joint account owned by Mr. and Mrs. Kreisberg and the other was held in the name of Mrs. Kreisberg, Hendry spoke only with Mr. Kreisberg.

Hendry was a natural salesman. Upon information and belief, Hendry fast became one of the biggest producers in his MS branch -- despite his lack of experience, and lack of knowledge regarding the financial products he was pushing. Based on how he handled the Kreisberg's accounts, it appears that Hendry accomplished this rare feat by engaging in unauthorized trading; pushing products he was not licensed to sell; lying about the nature and performance of the investments he pushed on his clients; guaranteeing profits; and failing to disclose the risks of the investments he touted.

Incredibly, Hendry also recommended that the Kreisbergs use margin loans to purchase interest-bearing investments despite the undisputed fact that *the interest rate on the margin loan was greater than the interest rate for the these investments*. In other words, Hendry's strategy of using high-interest margin loans to purchase lower interest bearing investments was a sure loser – except for Hendry, MS and Hendry's branch manager.

Upon information and belief, Steve Friedman was Hendry's branch manager. As such, Mr. Friedman was required to supervise Hendry and ensure that Hendry complied with the applicable laws and regulations. Instead, Mr. Friedman ignored Hendry's blatant and multiple violations of the securities (and other) laws and regulations because Hendry was making money for Mr. Friedman. Upon information and belief, a MS branch manager's compensation is based, in large part, on the commissions and fees generated by those he is supposed to be supervising. Because he had no experience and was generating large fees and commissions, Hendry should have been subject to heightened supervision. Instead, Mr. Friedman simply looked the other way because Hendry was lining his pockets with large amounts of money.

Approximately two years after MS hired Hendry, MS fired him. MS did not fire Hendry because MS had a sudden pang of conscience regarding the unethical and illegal manner Hendry

2

treated the Kreisbergs and his other customers. Rather. MS fired Hendry only because he was charged with a Felony by the State of Florida for breaking into someone's personal residence.[2]

During the short time between MS made its fateful decision to hire an alleged criminal and then fire the alleged criminal, Hendry caused the Kreisbergs to suffer damages due solely to Hendry's and Mr. Friedman's greed. Not only must the Kreisbergs must be compensated for their monetary losses, MS must also be punished to deter it from encouraging it salespersons to violate the law for no other reason than to increase their compensation with absolutely no concern for its customers.

I.  **Hendry's Recommendation That The Kreisbergs Use High Interest Margin Loans To Fund The Purchase of Low Interest-Bearing Securities Was Outrageous -- and Should Have Been Stopped By Hendry's Branch Manager.**

The Kreisbergs opened their joint account in July 2006 by depositing approximately $420,000 in cash. Hendry immediately purchased Auction Rate Securities ("ARS") worth $600,000.[3] The obvious question is how can an investor buy securities worth more than the value of his account. The answer in this case is shocking. Hendry recommended to Mr. Kreisberg to take out a margin loan with an interest rate higher than the yield on the ARS.

The ARS Hendry recommended were supposed to yield 5.35% of income annually. The interest on the margin loan was 7.25%. As such, it was impossible for the Kreisbergs to make money on this investment. Toward the end of 2006, Hendry recommended that the Kreisbergs sell their ARS and purchase United States Treasury Bills. By the end of 2006, based solely on Hendry's recommendation, the Kreisbergs owned Treasury Bills worth more than $681,000.

---

[2] After MS was forced to fire Hendry after Henry was charged with a Felony by the State of Florida, MS assigned responsibility for the Kreisberg's accounts to Carlos Granados. Granados and Hendry had worked together with respect to the Kreisberg's MS accounts prior to Hendry being fired for allegedly breaking the law.

[3] ARS are interest-bearing securities which Hendry touted as fully liquid and cash equivalents. This was a material misrepresentation. Recently, MS has agreed with State and Federal Securities regulators that MS will "not contest liability for any alleged misrepresentation and omissions concerning ARS."

These Treasury Bills were funded by a margin loan of more than $626,000! Like their ARS, Hendry's recommendation to purchase Treasury Bills was a sure loser for the Kreisbergs because the interest rate on the margin loan exceeded the expected yield on the Treasury Bills.

During the six months that the Kreisberg's account was open in 2006, MS charged the Kreisberg's almost $12,000 in margin interest. During the short time that the Kreisberg's MS accounts were open, the Kreisbergs paid MS more than $20,000 in interest on margin loans.

Even a broker as inexperienced as Hendry should have known that using high-interest margin loans to purchase lower interest-bearing securities was a sure loser and therefore wholly unsuitable. Indeed, a reasonably intelligent junior high school student would have realized that paying higher interest on a loan which is used to purchase a lower interest-bearing investment makes no sense. As such, the only conclusion that can be reached is that Hendry recommended margin for no other reason than to line his and MS' pockets -- at the expense of the Kreisbergs.

In addition to recommending high-interest margin loans to finance lower-interest bearing securities, Hendry and MS charged the Kreisbergs a management fee based on their assets in their MS accounts.[4] This type of fee structure is inappropriate and unsuitable for an account holding interest-bearing securities. It is also unsuitable where the account has relatively few transactions. *See e.g.*, FINRA NOTICE TO MEMBERS 03-68, *Fee-Based Compensation – NASD Reminds Members That Fee-Based Compensation Programs Must Be Appropriate.*

As Hendry's branch manager, Freidman had a duty monitor the Kreisberg's accounts and to supervise Hendry. Friedman was aware, or should have been aware, that the Kreisbergs had a huge high-interest margin loan to finance their purchase of lower-interest-bearing securities. Rather than supervising Hendry and undoing these "sure loser" transactions, Friedman did nothing. In addition, Friedman should have never allowed the Kreisbergs to pay a management

---

[4] It will be interesting to discover whether MS calculates the management fee based on the full value of the securities owned rather than the net value of the account after subtracting the margin loan.

fee. The only reason that Friedman, MS and Hendry charged the Kreisbergs a management fee was to increase their compensation.

### II. Hendry Guaranteed Profits; Engaged In Unauthorized Trading; Forced Mr. Kreisberg To Buy A Variable Universal Life Insurance Policy; and Sought Kickbacks from Mr. Kreisberg in the Form of Gold Bullion.

Hendry would often execute transactions in the Kreisberg's accounts without first obtaining their permission. Hendry would inform Mr. Kreisberg after-the-fact "what he had done" in the Kreisberg's accounts. When Mr. Kreisberg questioned why he executed transactions without his permission, Hendry admonished Mr. Kreisberg that Hendry was in "control" of the Kreisberg's accounts.

In addition to making unauthorized transactions in the Kreisberg's accounts, Hendry *guaranteed profits* on many of the trades made in the Kreisberg's account. In addition to unauthorized trading, guaranteeing profits is one of the most egregious violations of the securities laws and regulations. Upon information and belief, it appears that Hendry guaranteed profits on certain types of securities because he may have received special incentive compensation in connection with selling these securities. This may also explain why Hendry was very reluctant to sell these securities when specifically instructed to do so by Mr. Kreisberg. In addition, Hendry's reluctance to sell was because his compensation was based, in large part, by keeping as much of the Kreisberg's assets at MS.

In addition to making unauthorized transactions and guaranteeing profits, Hendry tricked Mr. Kreisberg into buying a Variable Universal Life Insurance Policy ("VUL") that he did not need -- and which was unsuitable for him. Specifically, Hendry informed Mr. Kreisberg that he would assist him in to obtain lines of credit on his family home and for his business *but only if Mr. Kreisberg purchased a VUL*. Upon information and belief, the commission a MS broker receives for selling a VUL is one of the highest commissions he can earn at MS. In any event,

5

requiring a customer to purchase an investment as a prerequisite for assisting the customer is not only a violation of FINRA rules but also reveals that Hendry was interested in one thing only – increasing his commissions.

In addition to making unauthorized transactions; guaranteeing profits; and requiring Mr. Kreisberg to buy a high-commission product, Hendry also sought kickbacks from Mr. Kreisberg on a potential business venture. Specifically, Hendry suggested to Mr. Kreisberg that Hendry could assist him in obtaining title work from Morgan Stanley Credit Corp. – a mortgage company affiliated with MS ("MSCC"). In return for his supposed assistance, Hendry told Mr. Kreisberg that he would be required to pay Hendry a kickback on any profits in the form of gold bullion. Not only would this have been a violation of FINRA rules, it appears to have been an attempt by Hendry to commit tax fraud.

### III. Hendry Lied To Trick Mr. Kreisberg To Obtain A Morgan Stanley Pledge Mortgage From An Affiliate of MS – A Financial Product That In Addition to Being Not Suitable For The Kreisbergs Was Also Illegal For Hendry To Sell.

On or about April 2007, Hendry learned that the Kreisbergs had just purchased a house. Hendry lied to Mr. Kreisberg to convince him to obtain a pledge mortgage from MSCC (the "MS Pledge Mortgage"). Not only was the MS Pledge Mortgage highly unsuitable for the Kreisbergs, it was illegal for Hendry to sell this product.

That Hendry has no concern for breaking the law is not a surprise as he has been charged with a Felony by State of Florida. In any event, Hendry convinced Mr. Kreisberg to obtain the MS Pledge Mortgage by lying regarding the terms, and failing to disclose the risk, thereof. The reason that Hendry made material misrepresentations and omissions regarding the MS Pledge Mortgage was because Hendry was highly compensated for tricking Mr. Kreisberg into this transaction. In addition to receiving direct compensation for selling the MS Pledge Mortgage,

6

Hendry's sale of the MS Pledge Mortgage to Mr. Kreisberg also indirectly increased Hendry's compensation.

### Hendry Lied Regarding The Terms, And Failed To Disclose The Risks, Of The MS Pledge Mortgage To Increase Hendry's Compensation

To close his sale of the MS Pledge Mortgage to Mr. Kreisberg, Hendry misrepresented the terms of same. Hendry also failed to disclose to Mr. Kreisberg the substantial risks of the MS Pledge Mortgage. Unfortunately, these risks materialized, forcing the Kreisbergs to close their profitable business, and thereby causing the Kreisbergs substantial damages. Hendry had no concern that the MS Pledge Mortgage was too risky, and unsuitable, for the Kreisbergs. Rather, his only concern was to make money for himself and MS.

Lying to convince Mr. Kreisberg to obtain the MS Pledge Mortgage increased Hendry's compensation in two different ways. First, Hendry received an exorbitant commission or "referral fee" for each MS Pledge Mortgage he sold to his unsuspecting customers. Second, unbeknownst to Mr. Kreisberg, the MS Pledge Mortgage required the Kreisbergs to keep a significant portion of their liquid net worth at MS. Because Hendry's compensation was based, in part, on the amount of the Kreisberg's assets at MS, lying to Mr. Kreisberg to convince him to enter into the MS Pledge Mortgage -- and therefore keeping a sizeable portion of the Kreisberg's assets at MS -- increased Hendry's compensation. Further, upon information and belief, in determining the value of assets under management, MS counts the value of a MS Pledge Mortgage. In any event, Hendry had a major conflict of interest in selling the MS Pledge Mortgage to Mr. Kreisberg.

To convince Mr. Kreisberg to obtain the MS Pledge Mortgage, Hendry lied about, and failed to disclose, material facts regarding the terms and risks of the MS Pledge Mortgage. Hendry's fist lie was initially informing Mr. Kreisberg that the MS Pledge Mortgage was "100%

7

financing" and therefore Mr. Kreisberg did not tie up any of his hard-earned money in his family's home. This statement was materially misleading.

If the MS Pledge Mortgage was actually "100% financing" as initially described by Hendry, zero percent (0%) of Mr. Kreisberg's hard-earned money would have been invested in – and at risk – his family's home. Instead, rather than 0%, the MS Pledge Mortgage required Mr. Kreisberg subject a significant portion of the value of his family's home to variety of risks associated with the investments used as collateral for the mortgage – or else lose his house to MSCC, an affiliate of MS. Put another way, the MS Pledge Mortgage put both Mr. Kreisberg's investments and his family's home at risk. Had Hendry fully explained the terms and risks of the MS Pledge Mortgage, Mr. Kreisberg would never have agreed to enter into the MS Pledge Mortgage.

Unbeknownst to Mr. Kreisberg, the MS Pledge Mortgage required the Kreisbergs to pledge as collateral securities in a separate MS account worth thirty nine percent (39%) of the value of the mortgage. The reason that Mr. Kreisberg was not aware of this substantial commitment of his funds is that Hendry never told him about it.

Based on Hendry's misrepresentation that the MS Pledge Mortgage was 100% financing – and based on Hendry's omission to inform Mr. Kreisberg that he was required to keep hundreds of thousands of dollars in a MS account – Mr. Kreisberg believed that money he deposited in his MS account was meant only to verify that he had those assets which he could thereafter withdraw – like many other "asset verification" mortgages being offered at that time.

In addition to Hendry's material misleading misstatement that Mr. Kreisberg would have to commit 0% of his hard-earned money as collateral -- versus 39% -- Hendry failed to disclose that that the MS Pledge Mortgage had a "maintenance" requirement. The "maintenance" requirement for the MS Pledge Mortgage is equal to thirty three percent (33%) the value of the

8

mortgage. Hendry never disclosed this to Mr. Kreisberg. Hendry also never disclosed to Mr. Kreisberg that if the value of the securities pledged as collateral fell below the "maintenance" requirement that he would be required to deposit additional securities or cash worth sufficient value to increase the pledged collateral back the original requirement of 39% of the value of the mortgage. If Hendry informed him of the "maintenance" requirement, Mr. Kreisberg would never have agreed to the MS Pledge Mortgage.

Hendry also failed to disclose to Mr. Kreisberg that if was unable to meet a "maintenance call" by depositing additional securities or cash, then the Kreisbergs could lose their family home to MSCC -- an affiliate of MS. Failing to make this disclosure was critical, as Hendry knew that the majority of the Kreisberg's liquid net worth was in their MS accounts and therefore they would likely not be able to deposit additional securities or cash in the event that the value of the pledged securities fell below the maintenance requirement. This is why FINRA has published an "Investor Alert" which states that Pledge Mortgages are "not suitable for everyone". The MS Pledge Mortgage was not suitable for the Kreisbergs because they did have enough additional cash or securities to pledge in the event the value of the initially pledged securities fell below the maintenance requirement.

As stated above, the initial value of the securities required to be pledged for a MS Pledge Mortgage is 39% of the value of the mortgage. The maintenance requirement was that the value of the securities be at least 33% of the value of the mortgage. If the value of the securities pledged falls below 33% then the holder of an MS Pledge Mortgage is required to deposit additional securities or cash to increase the value back up to 39% of the value of the mortgage.

For example, to obtain a $1 million MS Pledge Mortgage would require that securities valued at $390,000 (39%) be held in a MS account. If the value of these securities fell below $330,000 (33%), then the holder of the MS Pledge Mortgage would be required to deposit

9

securities or cash to increase the value of the pledged securities back to $390,000. If the investor is unable to do so, then MSCC has the right to sell the MS Pledge Mortgagor's house.

On or about October 2007, Mr. Kreisberg first became aware of the initial pledge requirement and of the maintenance requirement. Hendry did not disclose these requirements. Rather, the first time that Mr. Kreisberg discovered that he was required to keep hundreds of thousands of dollars tied up at MS is when he attempted to make a purchase with a debit card tied to the MS Pledge Account. Despite the fact that this account had hundreds of thousands of dollars in it, this purchase was rejected. Mr. Kreisberg was in shock, and immediately called Hendry.[5] Hendry finally told Mr. Kreisberg the truth – but only partially.

More than four months after he lied about, and failed to disclose, the terms of the MS Pledge Mortgage, Hendry finally informed Mr. Kreisberg that the MS Pledge Mortgage required that the Kreisbergs keep hundreds of thousands of dollars at MS. Even worse, it appears that Hendry purposely set the maintenance requirement too high so that the Kreisbergs would be forced to keep more of their hard-earned money at MS - for no other reason than to make more money for Hendry and MS.

Hendry informed Mr. Kreisberg that his attempted purchase with his debit card was rejected because the maintenance requirement was 33% greater than the value of the initial 39% requirement -- rather than 33% of the value of the mortgage. Using the same $1 million example, according to Hendry, the maintenance requirement would have been $518,700 ($390,000 multiplied by 133%) rather than $330,000 (33% of the value of the mortgage).[6]

---

[5] Mr. Kreisberg's testimony that he first learned that he would be required to keep hundreds of thousands of dollars at MS *well after he entered into the MS Pledge Mortgage* will be confirmed by an eyewitness to Mr. Kreisberg's reaction and his subsequent conversation.

[6] Mr. Kreisberg was also told this by Carlos Granados. At this time, it is not clear if Hendry and Granados lied to Mr. Kreisberg regarding the amount of the maintenance requirement. However, in at least one other case, MS, MSCC and/or Hendry set the pledge amount and maintenance requirement

At the time that Mr. Kreisberg sought to withdraw some of his hard-earned funds with his debit card, it appears that the value of the Kreisberg's pledge account was well above the "real" maintenance requirement and he therefore should have been able to make his requested withdrawal. In any event, Mr. Kreisberg was told that in order to free up a small portion of his money -- so that he would be able to pay his bills -- he would be required to pay $327,600 to MSCC to pay down the MS Pledge Mortgage so that the Kreisbergs would no longer be required to pledge securities as collateral on their family home. Because he desperately needed to free up some money to pay his family's day-to-day expenses, Mr. Kreisberg reluctantly wired this substantial sum to MSCC from his MS account on October 23, 2007. Unfortunately for the Kreisbergs, being required to put $327,600 into their family home forced them to close their profitable business causing them substantial damages.

In sum, Hendry did not inform Mr. Kreisberg of the terms and risks of the MS Pledge Mortgage because Hendry was highly compensated for tricking Mr. Kreisberg into obtaining the MS Pledge Mortgage. MS also indirectly compensated Hendry for selling the MS Pledge Mortgage, because unbeknownst to Mr. Kreisberg, the Kreisbergs were required to keep hundreds of thousands of dollars at MS which increased Hendry's compensation as it was based on the amount of assets in the Kreisberg's accounts. Mr. Kreisberg would never have entered the MS Pledge Mortgage if Hendry did not lie, and fail to disclose, the terms and risks of same.

### Hendry Was Required To Be Licensed By The State of Florida To Sell The MS Pledge Mortgage to Mr. Kreisberg – But He Was Not

To solicit a mortgage in the State of Florida a person is required to be licensed as a mortgage broker. *See* Fla. Stat. § 494 *et seq.* To obtain a license as a mortgage broker a person is required to attend many hours of classes approved by the State of Florida. *Id.* After attending

---

higher than 39% and 33% of the value of the mortgage. The effect of these higher amounts was to force the MS customer to keep more of his hard-earned money at MS thereby increasing the compensation of MS, Hendry, Granados and Friedman.

these required classes, to be legally able to solicit a mortgage in the State of Florida, a person is required to pass a test administered by the State of Florida. *Id.* Upon information and belief, Hendry neither attended any of the required classes nor took or passed the required test, nor was he licensed to sell the MS Pledge Mortgage to the Kreisbergs.

Hendry violated Florida Law by soliciting the MS Pledge Mortgage he was not licensed by the State of Florida to sell. It is not surprising that Hendry violated Florida Law, as it appears that Hendry believes that laws do not apply to him: as stated above, Hendry is currently facing Felony charges by the State of Florida that he broke into someone's personal residence. In any event, it would not have been improper for Hendry to refer Mr. Kreisberg to someone at MSCC who was properly trained and licensed as a mortgage broker to explain the terms and risks of the MS Pledge Mortgage. Hendry never did so. Indeed, the Kreisbergs never spoke with anyone at MSCC regarding the terms and risks of the MS Pledge Mortgage. In fact, Hendry was the only person that Mr. Kreisberg spoke with regarding the MS Pledge Mortgage.

The bottom line is that had Hendry accurately described and disclosed the terms and risks of it, Mr. Kreisberg would never have agreed to obtain the MS Pledge Mortgage. Rather than being truthful and forthright, Hendry lied to convince Mr. Kreisberg to obtain the MS Pledge Mortgage. The reason for Hendry's misrepresentations and omissions regarding the MS Pledge Mortgage was increase his compensation in two ways: Hendry received a substantial commission for the initial transaction and Hendry increased the management fees earned by him and MS by forcing the Kreisbergs to keep more of the their hard-earned money at MS.

### IV.   Mr. Friedman Failed To Supervise Hendry.

As his branch manager, Mr. Friedman had a duty to supervise Hendry. Friedman failed miserably. Given Hendry's lack of knowledge and experience, Mr. Friedman should have been

paying extra attention to the manner in which Hendry generated large fees and commissions within a short time of being hired.

Rather than fulfill his duty to supervise Hendry, Mr. Friedman looked the other way. The reason is that, upon information and belief, Mr. Friedman's compensation was based in part on the revenues that Hendry generated for MS. Had Mr. Friedman not breached his duty to supervise Hendry, the Kreisbergs would not have suffered much of the damages inflicted upon them by Hendry.

### MS' Conduct Violated The Duties That It Owed To The Kreisbergs

The Kreisbergs relied on Hendry for investment advice and recommendations. The Kreisbergs trusted that Hendry would not execute any transactions without their permission and trusted that Hendry would not make material misrepresentation and material omissions of fact. The Kreisbergs also trusted that both Hendry and Mr. Friedman would put their interest ahead of their own. Hendry and Mr. Friedman knew that the Kreisbergs relied upon Hendry for truthful and suitable advice. Hendry and MS assumed the duty to act as the Kreisbergs fiduciary, and were obligated to exercise the highest degree of care in their treatment of them. Notwithstanding these duties, Hendry's and MS' knowledge of the Kreisberg's reliance on Hendry, Hendry made untruthful statements and failed to disclose material facts which caused the Kreisbergs to sustain substantial damages.

### Summary of Claims

MS willfully, consciously, and recklessly violated the high standards of commercial honor and just principles of trade to which it is subject. The violations that occurred as a result of Hendry's recommendations, misrepresentations, omissions, and other actions described above include the following:

a. Failure to treat the Kreisbergs in a just and equitable manner;[7]

b. Negligence, gross negligence, negligent misrepresentation and omission, and negligent supervision;[8]

c. Fraudulent misrepresentations and omissions;

d. Breach of fiduciary duty;

e. Breach of contract; and

f. Violation of the Florida Securities and Investor Protection Act, Fla. Stat. §517, *et seq.*[9]

---

[7] Arbitrators may do justice as they see fit by applying their own sense of equity to the facts and by making an award reflecting the spirit of the agreement between the parties. *See e.g., Silverman v. Benmor Coats, Inc.*, 461 N.E.2d 1261 (N.Y. App. Div. 1984).

[8] The standards of the profession are set forth in the rules of FINRA (including its Notices to Members), the NYSE, and the SEC; federal and state securities statutes; firm compliance manuals and procedures and relevant case law. MS was obligated to provide competent, professional securities services in accordance with those industry rules, regulations, customs and practices. While violations of these standards may not be deemed to constitute separate causes of action, they are properly asserted as standards of care against which MS' conduct must be measured in determining its liability. Indeed, courts have consistently recognized that evidence of a violation of an SRO rule is admissible as evidence of the standard of care that broker-dealers owe their customers. *See e.g. Mihara v. Dean Witter & Co., Inc.* 619 F.2d 814, 824 (9th Cir. 1980) ("The admission of testimony related to [NYSE and FINRA] rules was proper precisely because the rules reflect the standard to which all brokers are held."). MS failed to abide by many FINRA and NYSE rules, including, but not limited to:

(a) FINRA Conduct Rule 2110 ("High Standards of Commercial Honor/equitable Principles of Trade");
(b) NYSE Rule 401 ("Good and Ethical Business Practices");
(c) FINRA Rule 2310 ("Suitability" of Recommendations);
(d) NYSE Rule 405 ("Know Your Customer");
(e) FINRA Rule 3010 ("Negligent Supervision"); and
(f) NYSE Rule 342 ("Negligent Supervision").

[9] All of the foregoing misconduct represents a violation of the Florida Securities and Investor Protection Act, Fla. Stat. §517, *et seq. See, e.g., Newsom v. Dean Witter Reynolds, Inc.*, 558 So.2d 1076, 1077 (Fla. 1st DCA 1990) ("an unsuitable trading violation of Section 517.301(1), Florida Statutes, is not merely technical. Just like churning, it is statutory fraud."). Hendry's misrepresentations and of omissions of material fact constitute: (a) a device, scheme, or artifice to defraud; (b) a method of obtaining money by means of untrue statements of material fact, and omissions of material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) a transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person. As such, the conduct described constitutes actionable fraud under Fla. Stat. §517.211.

## Relief Sought

As a result of the conduct set forth above, the Kreisbergs request that the arbitrators issue an Award in their favor and that the arbitrators grant the Kreisbergs the following relief:

(a) damages based on fairness and equity;

(b) compensatory damages that the Kreisbergs have suffered as a result of MS' misconduct and prejudgment interest on all such damages at the statutory rate pursuant to Fla. Stat. §517.211;

(c) punitive damages in an amount sufficient to punish a corporation with the net worth of MS;

(d) attorneys' fees and costs pursuant to Fla. Stat. §517.211(6); and

(e) such other and additional relief as the Panel may deem just and proper.

Respectfully submitted,

By: /s/ NBS
Neil B. Solomon
Neil B. Solomon, P.A.
4174 St. Lukes Lane
Jupiter, Florida 33458
Phone: 561-762-4991
Fax: 561-626-6721
email: neilbsolomonesq@gmail.com
*Attorney for Claimants*

## CERTIFICATE OF FILING

I hereby certify that a true copy hereof was filed electronically on this 9th day of September 2008 with:

FINRA, Inc.
Office of Dispute Resolution
165 Broadway, 27th Floor
New York, NY 10006

/s/ NBS
Neil B. Solomon

15